**COMMERCIAL TRADING COMPANY,
Inc., Plaintiff,**

v.

**HARTFORD FIRE INSURANCE COM-
PANY, a corporation, Defendant.**

**No. 67–88 Civ. T.**

United States District Court,
M. D. Florida,
Tampa Division.

April 9, 1971.
As Amended April 23, 1971.

Thomas C. MacDonald, Jr., of Shackleford, Farrior, Stallings & Evans, Professional Assn., Tampa, Fla., for plaintiff.

Dewey R. Villareal, Jr., of Fowler, White, Gillen, Humkey & Kinney, Professional Assn., Tampa, Fla., for defendant.

## MEMORANDUM OPINION

KRENTZMAN, District Judge.

This suit was brought on an open marine cargo insurance policy to recover losses sustained by Commercial Trading Company, hereafter "Commercial", the holder of the order bills of lading covering four separate shipments of frozen meat which were delivered to Progressive Meat Packers, Inc., hereafter "Progressive", the notify party, and the named insured in the ocean cargo policy. The shipowner delivered the meat to Progressive without first requiring the surrender of the order bills of lading. Commercial contended that the loss occurred at the very moment of unloading. (The policy covered " * * * until unloaded at port of destination * * * ".) The goods were transferred from the ship directly to trucks on the wharf. Progressive furnished the trucks.

Hartford, the insurer, asserted in defense that Commercial was a loss payee only, not an insured, and could not recover if the named insured, Progressive, could not (and that Progressive could not because it received the meat); that there was no loss within the policy period because it was agreed that the meat was carried from the loading port to the dis-

charge port and discharged from the ship without any physical loss or damage; and (3) that the cause of the loss was neither barratry nor like barratry because the persons at the discharge port to whom the shipowner had entrusted the management of the vessel, including the master and the general agent for the shipowner, had no intention of harming the shipowner.

It is the decision of this Court that Commercial was an insured within the meaning of the policy and that the "loss" occurred within the time that the policy was in force but that the case does not present a loss the result of barratry or of a peril like barratry or any other peril insured against for which Commercial may recover and that judgment should be for the defendant, Hartford Fire Insurance Company.

## BACKGROUND

From the stipulation of facts filed by the parties (Appendix A) and the deposition of W. N. Kirkconnell in Commercial's case against the M/V Kirk Co et al, mentioned below, it appears that early in 1962 Progressive Meat Packers, Inc., acting through William P. Benjamin set up a meat importation operation from Central America to several ports, including Tampa. Progressive arranged for the financing of the purchase of the meat by establishing a line of credit with Commercial Trading Company. Commercial in turn, through its bank arranged letters of credit with the Central Bank of Costa Rica under the terms of which the Central Bank of Costa Rica paid the shipper against the presentation of the usual bills of lading, invoices, and other documents. Progressive, through Benjamin, also arranged for the Kirk Co and the Kirk C to carry some of this meat from Puerto Limon, Costa Rica, to Tampa, Florida. The arrangements were negotiated with W. N. Kirkconnell, President of Kirkconnell Shipping Co., Inc., a Florida corporation, based in Tampa. Kirkconnell was the son of two of the owners of the vessels and the nephew of another.

For some months the shipments were made under straight bills of lading and then, in January, 1963, the first consignment of meat under an order bill of lading arrived. Kirkconnell inquired of Benjamin if the documents were in order and telephoned the shipper in Costa Rica with the same question and learned that the shipper had been paid. Knowing no one else in the venture and not appreciating the legal significance of the order bills of lading, Kirkconnell proceeded to cause the meat to be discharged and delivered into trucks provided by Progressive much as had been done when the goods moved under straight bills of lading.

Under the terms of Progressive's agreement with Commercial, warehouse receipts for the meat were delivered to Commercial by Progressive and the accounts receivable from the sale of the meat were assigned to Commercial. The difficulty, of course, lay in the fact that Progressive was using the same meat to "support" (1) bills of lading which Commercial was obtaining through the banks and (2) warehouse receipts which Commercial was obtaining from the Tampa warehouseman, with the result that Commercial thought it had a great deal more security than it did for the amounts it was loaning to Progressive.

Following the same pattern, the business continued until May 13, 1963, when Benjamin appeared in Commercial's offices and stated to Commercial's representatives that Progressive could no longer pay its current bills and had to give up the business. This was the first notice Commercial received that shipments had been delivered without procuring surrender of original bills of lading. The loss Commercial sustained after salvaging all that it could amounted to a sum in excess of $700,000. Where the rest of the money went has never been explained. Commercial brought suit to recover for the wrong delivery of a number of shipments against the vessels, Kirkconnell Shipping Co., Inc., and a number of individual Kirkconnells and relations and concerns in which they

were interested, and recovered some $65,-000. Commercial also recovered $200,-000, the policy limits of an insurance written by underwriters at Lloyd's against the issuance of fraudulent reports by Progressive in connection with the warehousing and sale of the meat after arrival here, and commenced this suit against Hartford Fire Insurance Company. On final hearing the plaintiff asserted claims under four bills of lading which it held on May 13, 1963, for the value of the cargoes described therein which had been delivered as described above.

## COMMERCIAL'S STATUS—LOSS PAYEE OR AN INSURED

Commercial contends that it is an insured under the policy as well as a loss payee. In support of this contention Commercial points to the fact that it was the holder of the order bills of lading pursuant to which the frozen meat was carried from Puerto Limon to Tampa and as such the owner of the meat. Commercial goes on to conclude that it was therefore one of those intended to be embraced by the language of the coverage endorsement of the policy reading:

"Subject to the amount(s) or limit(s) of insurance stated in the Declarations as applicable to this insurance, and to the exclusions, conditions, and all other terms of this policy and to the provision hereof:

1. *Property covered.*

This endorsement covers for account of whom it may concern, shipments of lawful goods and merchandise consisting principally of goods as described in Item 7 of the Declarations, lost or not lost under or on deck, consigned to, or shipped by the Insured, or consigned to or shipped by others for account or control of the Insured or in which they may have an insurable interest * * *"

The Court agrees with Commercial's contention.

It is true that the cover sheet of the policy provides that Hartford:

"Does insure the Insured, named in the Declarations made a part hereof, in consideration of the payment of the premium for a loss or damage which occurs during the policy period stated in the Declarations, and in reliance upon the statements in the Declarations and subject to all the terms of the policy."

It is also true that the Insuring Agreement on the cover sheet as follows:

"The insurance afforded shall be as stated in the Coverage Endorsement(s) issued to form a part of this policy, subject to the statements in and all the terms of the Declarations applicable thereto, and to the exclusions, conditions and all other terms of this policy."

The Court also recognizes that in the Declarations the Insured is designated as "Progressive Meat Packers, Inc." in Item 1 and that in Item 6 the loss payee item, "assured or Commercial Trading Co., Inc. 1440 Broadway, New York, New York, as interest may appear." is shown. The Court has considered the fact that these designations in the Declarations are typed and that the above quoted provision of the coverage endorsement is printed.

It is the decision of the Court that the language in the coverage endorsement is controlling and that the rule stated in Hooper v. Robinson, 98 U.S. 528, 25 L.Ed. 219 (1879), and Hagan v. Scottish Union & National Insurance Company, 186 U.S. 423, 22 S.Ct. 862, 46 L.Ed. 1229 (1901), controls.

## OCCURRENCE OF LOSS DURING POLICY PERIOD

The frozen meat under consideration arrived at Tampa and was physically discharged from the vessel and put into trucks furnished by the named insured, Progressive Meat Packers, without physical loss or damage in the usual sense. That is, the vessel delivered the packages of frozen meat in the same order

and condition as when received at the loading port and in the same quantity, passing them ashore in good condition. Commercial contends that a loss occurred within the period insured by the policy because the goods were put immediately into trucks furnished by the named insured-notify party, Progressive Meat Packers. The ship-owner's representatives failed to first demand and receive from Progressive copies of the order bills of lading covering the goods. As the goods moved directly from the side of the ship either on to a conveyor and directly into the trucks or were handed into the trucks, Commercial contends that a loss occurred in the act of unloading hence within the time prescribed by the Terms of Average of Endorsement No. 1 of the policy as follows:

"Coverage attaches hereunder from the time the merchandise is loaded on the vessel at port of origin, and continues until unloaded at Port of destination as follows * * *"

■ The Court is of the opinion that at the time the goods were discharged the policy was in effect.

## THE CAUSE OF THE LOSS WAS NOT CRIMINAL BARRATRY

■ Commercial has contended throughout that the cause of the loss was either the criminal barratry of the master and mariners or a like peril. The Court does not agree. From the Stipulated Facts, and from the deposition of W. N. Kirkconnell in the case of Commercial Trading Company v. M/V "Kirk C", No. 64–6 Adm. T. (M.D.Fla., Tampa Div.), which the parties have stipulated may be referred to in this case by the Court, the Court is convinced that the delivery of the meat by the shipowners' representatives without first demanding and obtaining the order bills of lading pursuant to which the meat was shipped in each instance, was the result of negligent conduct on the part of the shipowners' representatives but that criminal intent or indeed any intent to harm

the owners of the vessel was completely lacking.

In reaching this conclusion the Court has in mind the fact that the president of the corporation which was the general agent for the owners, Mr. W. N. Kirkconnell, was the son of two of the part owners of the vessels and nephew of another part owner. It was this same Mr. Kirkconnell who engaged the customs house brokers to handle the paperwork in connection with the arriving shipments of meat and who directed the stevedores to discharge and, in some instances even coordinated the scheduling of trucks to arrive and take the meat to the place designated by Progressive Meat Packers. The Court notes that when the transition from straight to order bills of lading occurred, Mr. Kirkconnell telephoned Progressive's Mr. Benjamin to inquire if it was in order to discharge the meat (and was told that it was) and telephoned the shipper's principal representative, Mr. Guzman, in Costa Rica and learned that Mr. Guzman had been paid for the meat and that it was in order for it to be delivered so far as Guzman was concerned. In view of Kirkconnell's testimony that the only people he "knew" in the transaction until after Benjamin had appeared at Commercial's offices and announced that the venture could not continue were Mr. Guzman, the shipper, and Mr. Benjamin of Progressive Meat Packers, the Court concludes that Mr. Kirkconnell was attempting to do that which should be done but failed to consult the proper parties to learn the true situation.

It would appear that Mr. Kirkconnell, and the principals he represented as general agent, delivered the meat because of a failure to appreciate the significance of the order bills of lading as documents of title and the importance of collecting such a bill of lading before delivering the goods.

The Court considers that this is not a case in which it is necessary or appropriate to fall back upon presumptions such as those urged by Commercial, that

shipowners intend the master to abide by the responsibilities imposed upon him by law.

Rather, the Court concludes that this case should be governed by the principle that barratry cannot be committed against an owner with his consent and that the consent of Mr. W. N. Kirkconnell, above described, was in effect the consent of the owners because he was acting as their general agent.

That an act, to be barratrous, must be committed against the owners of the ship is well established. Arnould, Marine Insurance, § 847 (15th Ed. 1961); Nutt v. Bourdieu, 1 T.R. 323 (1786); Marcardier v. Chesapeake Ins. Co., 8 Cranch 39, 3 L.Ed. 48 (U.S.1814); National Union Fire Ins. Co. v. Republic of China, 254 F.2d 177, 185 (4 Cir. 1958); Intermondale Trading Co. v. North River Co. of New York, 100 F.Supp. 128 (S.D.N.Y.1951).

As to the principle that an act done by a master with the knowledge of the owner or at his direction is not barratrous, even as to innocent shippers of cargo, See 38 C.J., Marine Insurance, § 294 and Arnould, Marine Insurance, § 844 (15th Ed. 1961) in which it is stated:

"[I]t is part of the very definition of barratry that it is an act done by the master and mariners in fraud of their duty to their owners—i. e., either the parties who are general owners of the ship, or the freighters, who, under the terms of the charter party, are her special owners for the voyage.

No act, therefore, can be barratrous which is sanctioned or authorized by those who are either the absolute owners of the ship, or her owners for the voyage. For, as Lord Mansfield said, 'nothing is so clear as that no man can complain of an act to which he himself is a party.' And in another place he said: 'barratry is something contrary to the duty of the master and mariners in the relation in which they stand to the owners of the ship. An owner cannot commit barratry;

he may make himself liable by his fraudulent conduct to the owner of the goods but not as for barratry; and besides, barratry cannot be committed against the owner with his consent.

Upon these principles it has been decided that the owner of the goods cannot recover as for loss by barratry in respect of any act of the master, however criminal, that is sanctioned by the owner of the ship."

In addition, Arnould states at § 837:

"It must also be carefully borne in mind that, in the absence of fraud, nothing but acts of known criminality, gross malversation, or the like can amount to barratry; loss arising from the ignorance or incompetence of the captain, from a mistake as to the meaning of his instructions, or misapprehension of the best mode of carrying them into effect, can never amount to barratry. The master, in fact, before he can be proved to have acted barratrously, must be shown to have acted against his better judgment; if he merely acted up to the best of his judgment, however bad, this is not barratry."

Halsbury, the Lord High Chancellor of Great Britain in his work The Laws of England (a complete statement of the whole law of England) Vol. XXVI (1914) summarizes the English law as:

"The master to be guilty of barratry must have deliberately violated his duty to his employer and acted against his better judgment. No act of negligence, inadvertence or mistake therefore amounts to barratry."

Insurance against barratry of the master and mariners of a ship does not cover their negligence, unless it be so gross as to amount to evidence of fraud. 5A Appleman, Insurance Law & Practice, § 3283. It is not sufficient that conduct of the master be merely negligent or accidental to constitute barratry. Obeying the owner's instructions in acting for the owner's interest clearly

would not fall within the purview of barratry.

■ Nor is the risk asserted by Commercial covered in the "like perils" clause. In order to be a "like peril" a risk must be peculiar to the maritime with the likelihood of such a loss being increased by the fact that the object of the injury is engaged in maritime activity. In short, the determinative factor is whether or not the peril with its consequent loss, or the loss from the peril, is peculiar to the maritime. Lacking such a quality, loss to property is an ordinary risk rather than a "like peril". Southport Fisheries, Inc. v. Saskatchewan Gov. Ins. Office, 161 F.Supp. 81 (E.D.N.C.1958).

The Court considers that Hartford has not shown that Progressive and Commercial failed to act with utmost good faith in applying for the insurance in question. Hartford's contention rested upon the fact that Benjamin had been convicted in New York of a crime involving dishonesty some years before the application for this insurance was made. Hartford contends that either Progressive or Commercial (whose management knew of the conviction having received a Dunn and Bradstreet report containing the information) should have advised Hartford of this part of Benjamin's history.

There is nothing in the record to indicate that Hartford would not have issued the insurance if it had known about Benjamin's criminal record. Hartford has not sustained its burden in this regard.

It is, therefore, the opinion of the Court, that Commercial Trading Company, Inc., should take nothing by this suit, with costs to follow the judgment.

The foregoing shall constitute findings of fact and conclusions of law. Final judgment will be entered by the Court in accordance with the findings and conclusions.

APPENDIX No. A

STIPULATION
ISSUE

The Court may decide the following question based upon the facts hereafter related, utilizing the pleadings herein and the documents hereafter enumerated:

Is the plaintiff entitled to recover its damages under either or both of the insurance policies issued by defendant (numbers 200M110014 and 200M110105) arising from shipment of cargoes of frozen beef from Puerto Limon, Costa Rica, to Tampa, Florida, aboard the vessels KIRK C and KIRK CO in March and April, 1963, under four negotiable bills of lading issued by or on behalf of said vessels or their owners hereafter specifically described, and the subsequent delivery from the said vessels of said cargoes to Progressive Meat Packers, Inc. at Tampa, Florida, without those acting on behalf of the vessels and their owners procuring the said bills of lading.

The four bills of lading are:

(1) KIRK C Bill of Lading 4, March 29, 1963

(2) KIRK CO Bill of Lading 1, April 23, 1963

(3) KIRK C Bill of Lading 1, April 30, 1963

(4) KIRK C Bill of Lading 4, April 30, 1963

The plaintiff has determined to restrict its proof to these bills of lading because of difficulties in securing proof.

The plaintiff thus seeks recovery for acts or omissions of the vessels or those acting for the vessels or their owners rather than for any act or omission of Progressive Meat Packers, Inc. although such acts or omissions may have coincided in time.

In the event the Court answers the question in the affirmative, i. e., in favor of the plaintiff, then it shall determine from the facts and documents hereafter

related the sum plaintiff is entitled to recover.

## FACTS

In 1962 Progressive Meat Packers, Inc. (Progressive) of Philadelphia, Pa., by its agent and employee, William B. Benjamin, (Benjamin) sought financing assistance from Commercial Trading Company (Commercial or plaintiff) in connection with proposed importation of meat from Central America to the United States. Commercial, through one or more of its officers and directors, knew, before entering into the financial arrangement with Progressive that Benjamin had been convicted about 1946 in a court of the State of New York of a criminal offense involving dishonesty, Commercial having received a Dunn & Bradstreet report which contained that information. The defendant was never informed by the assured or anyone else that Benjamin had been so convicted and the defendant never inquired of Commercial or of Progressive, orally or in writing, or by way of requested execution of an application, as to the existence or nonexistence of a criminal record of any officer of Progressive. Commercial was not aware, until after the events herein described, that the defendant was unaware of Benjamin's record.

Commercial extended to Progressive a line of credit in connection with the importation of meat from Costa Rica. Commercial advanced the purchase funds with which Progressive bought the meat through letters of credit which required the Costa Rican seller/shipper of the meat to draw the bills of lading covering the meat to the order of the Trade Bank and Trust Company of New York (Trade and Trust), the bank through which Commercial arranged the issuance of the letters of credit. The bills of lading were then sent by the shipper/seller through its Costa Rican bank to Trade and Trust where, after Commercial's account was charged with the amount of the accompanying drafts, they were endorsed to the order of Commercial and delivered to Commercial.

The bills of lading were released by Commercial to Progressive only after Commercial determined that it was adequately secured by security procured on earlier shipments. Commercial required Progressive to deliver to it warehouse reports covering the meat after it arrived in the United States, and to assign to Commercial its accounts receivable when the meat was sold to wholesalers in the United States.

The importation of meat commenced in April, 1962 and continued without the occurrence of any event which caused Commercial to be concerned until May 13, 1963.

Each of the shipments covered by the four bills of lading arrived at Tampa, Florida and was delivered by the ship to Progressive. The delivery was made directly from the ship to trucks which had been ordered by Progressive and were at the side of the ship to receive the cargo. The cargo was directly handed from the hold to the deck of the ship and thence into the trucks or passed from the deck of the ship into the trucks by roller conveyor. Neither crew, agents nor customs brokers of the vessels procured the bills of lading for the merchandise. Progressive did not surrender the bills of lading as it did not have them.

The meat shipped under the four bills of lading at Puerto Limon, Costa Rica, was as described in the bills of lading with one exception (described on the summary hereafter mentioned), was in good condition on shipment and was delivered by the ships in good condition upon arrival at Tampa. The meat was neither damaged nor lost in the course of the voyages.

Benjamin came into the offices of Commercial in New York on May 13, 1963 and stated that Progressive could not pay its obligations to Commercial and that the business would have to come to a halt. At this time, Commercial held the four bills of lading mentioned above, which had been endorsed and delivered to it by Trade and Trust, and was unaware that Progressive had received the meat

shipped under those bills of lading. Commercial thereafter dispatched representatives to Progressive's place of business and took possession of all the documents then to be found and endeavored to wind-up the business, and to collect its loans to Progressive.

Progressive had arranged for ocean marine cargo insurance to cover the meat to be shipped from Central America to the United States under the program above described, obtaining from defendant open marine cargo insurance policies from March 12, 1962. The first policy issued was 200M110014, which was cancelled on August 17, 1962, being replaced by 200M110105, which was effective August 17, 1962. Commercial received no notice of the cancellation.

Declaration of the shipment of the lot of meat moving under KIRK C Bill of Lading No. 4 of March 29, 1963 was filed dated April 17, 1963, and declaration of the other three shipments was filed dated June 5, 1963, and all purported to declare the cargoes for insurance under policy No. 200M110014. However, the defendant rendered premium statements on these declarations to its local agent on policy number 200M110105.

After the visit of Benjamin, Commercial discovered the pattern of delivery described above, and that its loans to Progressive exceeded its security. Commercial reported claims under three of the bills of lading in issue to the defendant and they were denied.

Commercial did not procure or receive the meat shipped under the four bills of lading, nor did it receive any other security therefor from Progressive.

Gerald Grossman, of Commercial, if called as a witness would testify that Commercial Trading Company, Inc.'s losses arising from the acts of Progressive Meat Packers, Inc., and the owners, crew and agents of the KIRK C and the KIRK CO were by May, 1964, reduced to $717,750.61 after liquidation of all accounts or collateral obtained by Commercial from Progressive. These losses included loans on shipments other than the four bills of lading in issue.

Commercial commenced suit in 1964 against the Motor Vessels KIRK C and KIRK CO and their owners and operators, asserting that Commercial's damages were the result of the failure of those in charge of the vessels KIRK C and KIRK CO to obtain original bills of lading covering the shipments of meat described in Exhibits B through Z and AA to the Complaint herein. Commercial received $65,000 from the vessels' owners and operators by way of settlement of those lawsuits which were compromised in 1965. The only property attached therein was the M/V KIRK CO which was appraised before settlement at $30,000.00. Notice was given to Hartford of the settlement.

Thereafter, on or about August 23, 1967, Commercial recovered $200,000.00 from underwriters at Lloyd's, London, the limits of insurance policies carried by Commercial to cover losses resulting from the issuance of fraudulent warehouse reports to Commercial by Progressive in connection with all of the shipments described in the Kirkconnell suit.

The particulars of the cargoes moving under the four bills of lading will be summarized in a table collating information in certain of the documents which the Court may consider.

The Court, without further proof, may consider documents in the following categories to be further listed in more detail by the parties:

(1) The bills of lading;

(2) the commercial invoices, freight bills and letters of credit;

(3) the declarations of insurance;

(4) the insurance policies;

(5) the Lloyd's insurance policy;

(6) the complaint in the suits brought against the carrying vessels, their owners and operators;

(7) correspondence between Hartford and Commercial.