COMMERCIAL TRADING COMPANY, INC., Plaintiff-Appellant-Cross Appellee,

v.

HARTFORD FIRE INSURANCE COMPANY, a corporation, Defendant-Appellee-Cross Appellant.

No. 71–2036.

United States Court of Appeals, Fifth Circuit.

Sept. 25, 1972.

Thomas C. Macdonald, Jr., Tampa, Fla., for plaintiff-appellant; Shackleford, Farrior, Stallings & Evans, Professional Assn., Lifsey & Johnston, Tampa, Fla., of counsel.

Dewey R. Villareal, Jr., Nathaniel G. W. Pieper, of Fowler, White, Gillen, Humkey, Kinney & Boggs, P. A., Tampa, Fla., Joseph T. McGowan, of Hill, Rivkins, Warburton, McGowan & Carey, New York City, for appellee-cross appellant.

Before JOHN R. BROWN, Chief Judge, and INGRAHAM and RONEY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

*"Touching the adventures and perils which the Company is contented to bear, and take upon itself, they are of the seas, fires, assailing thieves, jettisons, criminal barratry of the Master and Mariners, and all other like perils, losses and misfortunes that have or shall come to hurt, detriment or damage of the said goods and merchandise, or any part thereof except as may be otherwise provided for herein or endorsed hereon."*

So provides the traditional perils clause of the open marine cargo policy of insurance upon which Plaintiff-Appellant, Commercial Trading Company, the holder of order bills of lading covering

four shipments of Costa Rican meat, instituted this action against Insurer, Hartford Fire Insurance Company, to recover those losses occasioned by the ocean carrier's misdelivery of the cargoes to the notify party without first obtaining the outstanding order bills.[1] The question is whether delivery without surrender of order bills of lading is imputable to the shipmaster to make it thereby criminal barratry or "like" criminal barratry. The answer is: No.

■■ The Trial Court, over strenuous objections from Insurer, concluded that Commercial was an assured rather than a loss payee and further concluded that the loss occurred during the period of coverage provided by the policy. The Court held, however, that the loss was not occasioned by a peril insured against under the policy and rendered judgment in favor of Insurer. Both parties appealed. Commercial, of course, here contends that the Court was half wrong while Insurer advances the anchor-to-windward argument that the Court was only half right.[2] Finding ourselves in at least partial agreement with both parties, and in total agreement with the Trial Court, we affirm. In so doing, we limit our discussion (see note 2, *supra*) to the question of whether the misdelivery of the subject cargoes constituted a peril insured against under the policy.

## The Facts

The facts may here be severely capsulated. In 1962 Commercial Trading extended a line of credit to Progressive Meat Packers, Inc. a Philadelphia based meat importing company, under which Progressive was to continue the importation of substantial quantities of meat from Costa Rica.[3] Prior to Commercial's entry into the financial picture, shipments from the Costa Rican seller (Beef Products Co. Ltd.) to Progressive had moved from Puerto Limon to Tampa, Florida aboard M/V Kirk-Co and M/V Kirk-C. The ultimate destination and the method of delivery remained unchanged after Progressive's arrangement with Commercial crystallized. What did ultimately change, however, was the form of bills under which the shipments were carried. For prior to May 13, 1963, shipments from Beef Products to Progressive had moved under straight bills of lading. On that date the first of the four here involved—ultimately lost—shipments arrived under order bills which designated Progressive as the notify party and Commercial's financier, Trade Bank and Trust Company (see note 3, *supra*), as the order consignee. The carrier—guilty of the ultimate commercial faux pas—without first obtaining the outstanding order bills, delivered these four cargoes to Progressive. As a result of these misdeliveries, Commercial was left holding

---

1. For a detailed analysis of the underlying business agreements and a description of the factual setting surrounding the subject misdeliveries, see Judge Krentzman's well written opinion. Commercial Trading Co. v. Hartford Fire Ins. Co., M.D.Fla., 1971, 326 F.Supp. 900, 902–903.

2. Insurer argues that the Trial Court erred by holding that the loss occurred while the policy was still in force, and by holding that Commercial was an assured under the policy. For those reasons stated in the District Court's opinion, we find these arguments to be without merit and not warranting further discussion here. See *Commercial Trading Co., supra*, 326 F.Supp. at 903–904.

3. In quite an ordinary financial arrangement, Commercial advanced the sums needed for the purchases by arranging letters of credit through the Trade Bank and Trust Company of New York. As is customary, these letters of credit required that the Costa Rican seller/shipper draw the bills to the order of Trade and Trust, which upon receipt of the bills from the seller's Costa Rican bank charged Commercial's account for the amount of the accompanying drafts. This accomplished, Trade and Trust released the bills to Commercial, which in turn, upon determining that it had sufficient security from Progressive, was to—but in this case never did—release the bills to Progressive so it properly could then take delivery.

not only the negotiable bills covering the four never to be recovered shipments of Costa Rican meat, but worse the proverbial bag. For, as might well have been predicted, a short time after taking delivery of the subject shipments Progressive went broke.[4]

In this last ditch effort to recover its quite substantial losses,[5] Commercial urges that the misdeliveries constituted "criminal barratry". In the alternative, Commercial seeks to recover under the "all other like perils" clause of the policy.

### Criminal Barratry

*"Barratry must partake of something criminal and must be committed against the owner by the master and mariners."* [6]

Although we neither advocate nor condone illreasoned reliance upon rules of law having their foundations in factual settings which no longer exist,[7] this case presents a situation—most comforting to us in these times of marked and quite often dramatic change—where the applicable rule has at least outlived its pronouncer. For the business of marine underwriting is even today steeped in yesterday's traditions. Indeed, the policy provision here at issue is almost identical to that commonly used in Eighteenth Century England. See Saskatchewan Government Ins. Office v. Spot Pack, Inc., 5 Cir., 1957, 242 F.2d 385, 391, 1957 A.M.C. 655; Reliance Ins. Co. v. Escapade, 5 Cir., 1960, 280 F.2d 482, 488, 1961 A.M.C. 2410.

Particularly appropriate even today is Lord Mansfield's statement of some two hundred years ago.

> "The point to be considered is whether barratry, in the sense in which it is used in our policies of insurance, can be committed against any but the owners of the ship . . . It is clear beyond contradiction that it cannot. For barratry is something contrary to the duty of the master or mariners, the very terms of which require that it must be in the relation in which they stand to the owners of the ship . . [Barratry could only be committed] against the owners of the ship. The point is too clear to require any further discussion."

Nutt v. Bourdieu, 1789, 1 T.R. 323.

For several hundred years, countless assureds have attempted to broaden this traditional, and still adhered to notion of just what "barratry", as used in marine cargo policies, actually means. Commercial here joins that ever-increasing number, arguing that a shipmaster's delivery of cargo without surrender of negotiable bills of lading surely must fall within this long recognized and so often repeated definition. In this argument, however, Commercial presupposes that which we are not persuaded should be presupposed and ignores that which we are powerless to ignore.

■ For as Commercial—although reluctantly—recognizes, the most basic consideration in determining whether or not the acts complained of constitute

---

4. It was revealed during trial that the President of Progressive had been convicted in 1946 of an offense involving dishonesty. Neither W. N. Kirkconnell, the President of Kirkconnell Shipping Company, who released the shipments to Progressive, nor the Costa Rican seller had any knowledge of the President's past.

5. Commercial here seeks the third bite from the apple. Prior to instituting this action against Insurer, Commercial proceeded—with at least partial success—against the owners of the vessels. Commercial had also obtained a settlement from the underwriter of the financial

arrangement between it and the real villain, Progressive Meat Packers. Even deducting these amounts, however, Commercial's losses are still substantial, amounting to some $700,000.

6. Arnould, Marine Insurance, 13 ed., 1950, § 838 n. 75, quoting Lord Mansfield in Nutt v. Bourdieu, 1786, 1 T.R. 330.

7. "It is revolting to have no better reason for a rule of law than that so it was laid down in the time of Henry IV. It is still more revolting if the grounds upon which it was laid down vanished long since, and the rule simply persists from blind imitation of the past." Justice Oliver Wendell Holmes.

barratry is the question of whether or not those acts were committed by the master or mariners.[8] If they were not, of course, the inquiry abruptly halts. Here, there is considerable doubt that this most basic question could be answered in the affirmative. For the record clearly demonstrates that the master was given no formal instructions concerning the delivery or cargo by the owners and what informal directives he may have received came from none other than the owners' general agent, who not only had the primary management responsibility for the day to day operation of the vessels [9] but also actively participated in —if not directed—the premature delivery of the subject shipments to Progressive.[10] It is this active participation in the misdeliveries on the part of the general agent which gives rise to a very strong inference that at most the masters of M/V Kirk-C and M/V Kirk-Co did nothing more than follow the directions of the general agent, who had satisfied himself that everything was in order (see note 9, *supra*), in releasing the cargoes to Progressive.

In the practical, if not legal sense, it seems apparent that the shipmasters here involved—as is likely true of their counterparts in today's complex business world—were in this case victims of this "golden age" of specialization being supplanted in their clipper ship traditional responsibility by the general agent, his retained customs broker and that ever-increasing corps of paper processors and clerks.[11]

8.  Of course, as is so clearly pointed out by Lord Mansfield in *Nutt, supra*, a second essential is that an act cannot be considered barratrous unless it is against the owners of the vessel. Commercial argues that since a shipowner may ultimately be held liable in money damages for the misdelivery of cargo, any such misdelivery constitutes an act "against the owners of the ship" and, therefore, constitutes criminal barratry. This is, of course, an attempt by the shipper to vicariously put itself in the role of the shipowner. This highlights the factual necessity of establishing that the delivery without surrender of its bills of lading was contrary to the directions of the shipowner, not just a breach of some ordinarily applicable obligation.

9.  There was more than enough evidence to support the express or implied finding that the Kirkconnell Shipping Company acting through its President, W. N. Kirkconnell, was the general agent of the shipowners. Some of the duties regularly performed by Mr. Kirkconnell in regard to the Kirk-C and the Kirk-Co included: (1) Manning the vessels with crewmembers, (2) Contracting with stevedoring companies to discharge the vessels, (3) Notifying the local customs broker of the vessels' arrival so customs broker could handle customs matters and some other activities delegated to it such as pilotage and immigration, (4) Alerting receiving warehouse and Progressive of arrival of the vessels, (5) Collecting freights, (6) Paying the crews, (7) Paying fuel bills (8) Reporting to British Government regarding crewmembers employed, and (9) Coordinating activities of stevedore and warehouseman.

    As Mr. Kirkconnell characterized it, his Kirkconnell Shipping Company was for all practical purposes the operator of M/V Kirk-C and M/V Kirk-Co, with Mr. Kirkconnell assuming the complete day to day management of the vessels. The vessels were owned by entities in Grand Cayman which were owned by his close relatives.

10. Prior similar shipments between the same parties had moved under straight bills. Mr. Kirkconnell—the President of Kirkconnell Shipping, the general agent for the owners—upon discovering a change in the form of the bills under which the first of the four subject cargoes was shipped, immediately called the parties with whom he had previously dealt in order to determine whether or not he should continue the former practice of delivering the shipments to Progressive. Upon being assured by the Costa Rican seller's representative that he had received his money, and upon being informed by the President of Progressive (see note 4, *supra*) that it would be alright to proceed as before, the shipments were released to Progressive. Thus, the general agent called everyone but the only one—the order consignee—who had a right in or to the goods.

11. Throughout the general agent's testimony on deposition, he repeatedly stated that the customs broker, aside from his primary duty of clearing the shipments through customs, had the responsibility of making sure all documents, etc., were in

Of course, Commercial's claim rests on a theory that since it constitutes a legal wrong—civil at least, and perhaps sometimes criminal [12]—for which a shipowner may suffer loss at the hands of the unrequited shipper this is a sufficiently grave act of wrong against the owner to satisfy the pungent language of the definitions.[13]

But this theory is not enough here. For this record reveals that neither the shipowner nor its managing general agent ever for a moment entertained the idea that its shipmasters were to stand by the hatches to personally obtain outstanding bills of lading before releasing the sling load to an awaiting receiver. Granted that this was within shipowner's powers and the bills of lading in traditional legalese made the shipmaster an identified actor in the process of receipting for the goods, the law did not compel shipowner to demand that the shipmaster carry out any such duty. To the contrary, both the silence of this record and the action of the general agent (note 10, *supra*) were more than enough to support the conclusion that this was not the case of shipmasters, properly instructed in their duties as to cargo delivery, breaching the obligations with that perverseness required to satisfy the ancient characterization of criminal barratry.

■ But even if—and the if is quite a big one—these acts can be considered those of the shipmasters, Commercial still runs headlong into Judge Krentzman's findings—passing the *Plimsoll* line of F.R.Civ.P. 52(a)—that although the misdeliveries *were* the result of negligence on the part of the shipowners' representatives—shipmaster or others— there was no criminal intent on the part of anyone involved to defraud or in any way harm the owners.[14]

■ For as the Trial Judge so correctly recognized, "in the absence of fraud, nothing but acts of known crimi-

---

order. But his own testimony that when the first cargo moving under order bills arrived in Tampa, he had sought information from the seller and Progressive as to the proper method of delivery, (see note 10, *supra*), amply supports the inherent finding that the general agent considered that he had a responsibility for critical decisions on cargo delivery.

12. Commercial in this regard stresses 1969 Fla.Stat.Ann. § 812.01, F.S.A.; 18 U.S. C.A. § 2274 and 18 U.S.C.A. § 659.

13. See some ancient holdings pressed by Commercial.

"We are certainly warranted in pronouncing that a fraudulent breach of duty by the master, in respect to his owners; or, in other words, a breach of duty in respect to his owners, with a criminal intent, or ex maleficio, is barratry. And with respect to the owner of the ship or goods, whose interest is to be protected by the policy, it can make no difference in the reason of the thing, whether the prejudice he suffers be owing to an act of the master, induced by motives of advantage to himself, malice to the owner, or a disregard to those laws which it was the master's duty to obey, and which (or it would not be barratry) his owners relied upon his observing." Earle v. Rowcroft, 8 East 126, 103 English Reprint 292 (1806).

"This (fraud) is not necessary * * * a gross malversation by the captain in his office is barratry." Heymans v. Parish, 2 Campbell 149, 170 English Reprint 1111 (1809).

"The word barratry was large enough to include every species of fraud or malus dolus." Beohm v. Combe, 2 Maule and Selwyn, 172, 105 English Reprint 172 (1813).

"Nothing can be so general. * * * [Barratry] comprehends every species of fraud, knavery or criminal conduct in the master by which the owners or freighters are injured." Vallejo v. Wheeler, 1 Comper 143, 98 English Reprint 1012 (1774).

"The term 'barratry' includes every wrongful act willingly committed by the master or crew to the prejudice of the owner, or, as the case may be, the charterer." English Marine Insurance Act of 1906, Schedule 1, Rule 11.

14. Indeed, Judge Krentzman specifically found that "Mr. Kirkconnell, and the principals he represented as general agent, delivered the meat because of a failure to appreciate the significance of the order bills of lading as documents of title and the importance of collecting such a bill of lading before delivering the goods." *Commercial Trading, supra,* 326 F.Supp. at 904.

nality, gross malversation, or the like can amount to barratry; loss arising from the incompetence of the Captain, from a mistake as to the meaning of his instructions, or misapprehension of the best mode of carrying them into effect, can never amount to barratry * * *." *Arnould, supra,* at 768. Here, although the misdeliveries most certainly resulted from ignorance on the part of the owners' general agent as to the legal significance of the order bills (see note 14, *supra*) the acts of the shipmasters clearly do not reach that degree of malversation necessary to provide a basis for recovery under the "criminal barratry" clause. Echoing Lord Mansfield's optimistic utterance of some two hundred years ago, "the point is too clear to require any further discussion." The misdeliveries did not constitute criminal barratry.[15]

### All Other Like Perils

■ Recognizing full well that the "all other like perils" clause of the policy "is not to be brushed aside as 'essentially a flourish, adding nothing of substance'," Feinburg v. Insurance Company of North America, 1 Cir., 1958, 260 F.2d 523, 527, we begin our consideration in this regard with the further recognition of the far from startling proposition that a "like peril" must indeed be a *like* peril, "[the other like perils clause] does not, of course,

cover perils unlike those enumerated. * * * [I]ts obvious purpose was to include in the coverage all losses which, although perhaps not technically or strictly speaking covered in the specific perils enumerated, are very similar to or very much like the enumerated perils." *Feinburg, supra,* 260 F.2d at 527.

■ Aware of the glaring dissimilarity between the misdelivery of cargo on one hand and the other specified perils on the other, Commercial contends that such misdelivery is so much like "criminal barratry" as to fall within the ambit of coverage. The Trial Court, relying primarily upon the District Court's opinion in Southport Fisheries, Inc. v. Saskatchewan Government Insurance Office, E.D.N.C., 1958, 161 F.Supp. 81,[16] held that since the risk here involved was not "peculiar to the maritime" coverage was not provided under the like perils clause. *Commercial Trading, supra,* 326 F.Supp. at 906. Here, Commercial attempts to refute this conclusion by arguing that since an ocean going vessel and ocean bills of lading were involved, the misdelivery of the subject cargoes literally "reeked with the smell of the sea". Except to concur in this odor test, we find it unnecessary to resolve this question since to be somewhat "like" criminal barratry at least requires a moral characteristic to take the omissions of the shipmasters out of the category of negligence, yea even seagoing ignorance or stupidity.

15. The Trial Court chose to base its decision at least in part upon the well settled rule that barratry cannot be committed against the owner with his consent, and held that the consent on the part of the general agent (see note 10, *supra*) was the consent of the owners. Relying upon the District Court's decision in Republic of China v. National Union Fire Ins. Co., D.Md., 1957, 151 F.Supp. 211, Commercial contends that even if this agency relationship existed any consent to the misdeliveries by the agent could not amount to the consent of the owners. We think it better to approach it as we have, not in terms of consent, but total absence of proof that the shipmasters were violating instruc-

tions and the overwhelming affirmative proof that the general agent was to do it all through such representatives as he chose.

16. "[A]n examination of the perils set forth in the policies discloses that each has become particularly feared by the maritime world because . . . the likelihood of loss from such risks. It is this quality which is common to the . . . risks formerly discussed as being within the term 'perils of the sea', and in the Court's opinion it is the sole ingredient essential in order to qualify a risk as a 'like peril' within the coverage of the policy." *Southport Fisheries, supra,* 161 F.Supp. at 84.

Whether the beacon is a *Feinburg* light, or a *Southport Fisheries* light, or a *Feinburg-Southport Fisheries* light, or even a *Southport Fisheries-Feinburg* light, we reach the same conclusion. Commercial loses.

Affirmed.