404 So.2d 511 (1981)
Daniel E. CAMBRE
v.
The TRAVELERS INDEMNITY COMPANY, John W. Dussouy and Company, Inc., and XYZ Insurance Company.
No. 12027.
Court of Appeal of Louisiana, Fourth Circuit.
July 30, 1981.
Rehearing Denied October 20, 1981.
William M. Detweiler, New Orleans, for plaintiff-appellant.
Jones, Walker, Waechter, Poitevent, Carrere & Denegre, Glenn G. Goodier, New Orleans, for The Travelers Indem. Co., defendant-appellee.
Porteous, Toledano, Hainkel & Johnson, Ralph R. Alexis, III, New Orleans, for John W. Dussouy & Co., Inc., defendant-appellee.
Before GULOTTA, GARRISON and CHEHARDY, JJ.
CHEHARDY, Judge.
Plaintiff, Daniel E. Cambre, appeals a district court decision in favor of defendants The Travelers Indemnity Company (Travelers) and John W. Dussouy & Company, Inc. (Dussouy), and against the plaintiff, dismissing his suit at his cost.
In his written reasons for judgment, the trial court made the following findings:

*512 "The Court finds that the plaintiff asked for full coverage on his boat, without enumerating the specific perils.
"The agency obtained a named Perils policy which was the best obtainable.
"The policy does not cover the theft of the vessel.
"The Court finds no liability on the Insurance Agent."
At a trial on the merits of the case the plaintiff testified that in May of 1978 he owned a 1977 "Lafitte skiff" for the purpose of commercial crabbing and shrimping, and for which he had secured, through Dussouy, an insurance policy (covering a period from March 1978 through March 1979), written by Travelers. Cambre testified he had called Arthur Caron, an employee of Dussouy, and asked him to get full coverage, enumerating "fire, theft, collision, liability," and using the words "just like an automobile." He added that when Caron called him back, although he stated he had had a little trouble getting the coverage, he said he had gotten it placed with Travelers and that "I had full coverage, not to worry about it." Two or three months later Cambre received a copy of the policy, and Dussouy also assisted him in getting the financing on the policy.
Cambre testified further that on May 17, 1978, he went out to run his crab traps and when he was coming in he had trouble with the boat's motor, which stopped running. He said he then tied up the boat to the bank of "Ship Channel," took the keys, and walked for about a half a mile before getting a ride back to the marina. He added the man who ran the marina was busy, and consequently, by the time he secured another boat with which he returned for his own boat, it was approximately an hour or an hour and fifteen minutes later, and his boat was gone. He subsequently reported its disappearance to the St. Bernard Parish Police and to Caron at Dussouy.
The plaintiff said Caron was "kind of surprised himself" when he told Cambre that Travelers had denied coverage on the claim. He testified he had sustained losses in crab sales due to the loss of the boat and his financial inability to secure a comparable craft.
Caron testified that upon making the claim for Cambre, Travelers told him the subject policy "did not cover disappearance by theft." He also said the plaintiff did not ask him for full coverage but only for boat coverage and that the application only called for "full marine coverage" which was the best coverage available. He added he did not get into the details with Cambre as to what was included in full marine coverage.
Caron also noted he had approached no less than six carriers (most of whom refused to insure a used Lafitte skiff under any circumstances) before he finally secured coverage on the vessel with Travelers. He also stated the unearned premium on the policy was returned to the plaintiff after the craft's disappearance.
Thomas H. Elliott, IV, owner of a wholesale marine insurance brokerage called Vessel Coverages Limited, who was accepted by the court as an expert in the marine insurance brokerage field, explained that the subject insurance policy is a "named risks" rather than an "all risks" policy. He also said the Travelers policy was the best and broadest coverage which could be obtained on a commercial vessel of the nature of the skiff in this case.
The application for marine insurance, dated March 27, 1978, and signed by the plaintiff, stated the cost to replace the vessel as $8,000 and also set the insured value at $8,000. Under the heading of "Coverage Desired" was checked "full marine coverage."
The actual insurance policy issued to Cambre by Travelers on the subject craft stated the following:
"PERILS
"Touching the Adventures and Perils which the Underwriters are contented to bear and take upon themselves, they are of the Waters named herein, Fire, Lightning, Earthquake, Assailing Thieves, Jettisons, Barratry of the Master and Mariners and all other like Perils that shall *513 come to the Hurt, Detriment or Damage of the Vessel.
"ADDITIONAL PERILS (INCHMAREE)
"Subject to the conditions of this Policy, this insurance also covers loss of or damage to the Vessel directly caused by the following:
Accidents in loading, discharging or handling cargo, or in bunkering;
Accidents in going on or off, or while on drydocks, graving docks, ways, gridirons or pontoons;
Explosions on shipboard or elsewhere;
Breakdown of motor generators or other electrical machinery and electrical connections thereto, bursting of boilers, breakage of shafts, or any latent defect in the machinery or hull, (excluding the cost and expense of replacing or repairing the defective part);
Breakdown of or accidents to nuclear installations or reactors not on board the insured Vessel;
Contact with aircraft, rockets or similar missiles, or with any land conveyance;
Negligence of Charters and or Repairers, provided such Charterers and or Repairers are not an Assured hereunder;
Negligence of Masters, Officers, Crew or Pilots;
provided such loss or damage has not resulted from want of due diligence by the Assured, the Owners or Managers of the Vessel, or any of them."
Admittedly, it has been held by the courts, as in Jennings v. Louisiana & Southern Life Insurance Co., 280 So.2d 297, 300 (La.App. 1st Cir. 1973):
"A contract of insurance, like any other agreement, is the law between the parties, and every stipulation therein must be construed as written. The rules established for the interpretation of written instruments in general apply in the construction of insurance policies. Harmon v. Lumbermen's Mutual Casualty Company, 247 La. 263, 170 So.2d 646.
"Courts must give legal effect to the provisions of an insurance policy according to the true intent of the parties, which intent must be determined in the light of the policy provisions when the policy terms are clear and unambiguous and lead to no absurd consequences. LSA-C.C. arts. 1901, 1945; Vidrine v. Southern Farm Bureau Casualty Insurance Company, La.App., 247 So.2d 660.
"The words used in insurance contracts are to be understood in their common and usual significance, without attending so much to grammatical rules, as to general and popular use. LSA-C.C. art. 1946; Harmon, above."
However, it was also held in Jennings:
"Appellant correctly contends that in the interpretation of insurance contracts, doubtful or ambiguous clauses or provisions are to be construed favorably to the insured and against the insurer. Graves v. Traders and General Insurance Company, La.App., 200 So.2d 67. This rule of strict construction, however, does not authorize perversion of language or the creation of ambiguity where none exists. J. M. Brown Const. Co. v. D & M Mechanical Contr., Inc., La.App., 222 So.2d 93." 280 So.2d at 300.
Plaintiff now argues the theft of his boat should be covered under either the phrase "Assailing Thieves" or the phrase "and all other like Perils that shall come to the Hurt, Detriment or Damage of the Vessel." We cannot agree.
The court noted in Northwestern Mutual Life Insurance Co. v. Linard, 498 F.2d 556 (2nd Cir. 1974), that although in an "all risks" policy the burden is plainly on the underwriter to show that an exception to coverage applies, the burden of proof is on the insured to show that the loss was proximately caused by the peril insured against and claimed under.
Furthermore, in the case of S. Felicione & Sons Fish Co. v. Citizens Casualty Co. of N. Y., 430 F.2d 136 (5th Cir. 1970), the court said at 139-140:
"We are convinced that the term `assailing thieves' in marine policies provides *514 coverage for theft by force or violence of personal property on vessels, not coverage for the theft of the vessel itself. We have researched the subject exhaustively. All the authorities we found dealing with the term `assailing thieves' arise in the context of taking of goods aboard a vessel; none construe the term with reference to a taking of the vessel itself. See, e. g., Swift v. American Universal Ins. Co., 1965, 349 Mass. 637, 212 N.E.2d 448 and cases there cited; Babbitt, Goode & Co. v. Sun Mutual Insurance Company, 1871, 23 La.Ann. 314; Annot., 19 A.L. R.3d 1150.
* * * * * *
"In D. Winter, Marine Insurance (3rd Ed. 1952) the author in discussing theft of goods on board ship says:
* * * * * *
The peril of thieves, as covered by the marine-insurance policy, is generally recognized by merchants and by the textbook writers as that of the taking of property by force, as distinguished from taking by stealth, which latter form of larceny is known by the specific term pilferage. It was always the intention of underwriters to protect property on vessels from losses occasioned by the criminal acts of those who obtained access to the property by force. Pilferage, however, was not contemplated by the underwriter when property was insured, because such loss was supposed to be the result of the criminal acts of those who had a right to be with the property, such as stevedores or others who by stealth mingled with them and thus had access to the goods. Unfortunately, this theory and practice were overridden in certain state courts, where the judge, in an academic discussion of the meaning of the word `thieves,' ignored for the most part the practice of the merchants and underwriters which, of old, was the basis on which marine-insurance law was determined and held that the word `thieves' covered what is commonly known in marine circles as pilferage. Accordingly, most policies in use in the United States have inserted the words `assailing thieves' in order to make clear the original and present intention of underwriters insuring against thieves. (Emphasis supplied) Id. at 184. See also Arnould's Eleventh Edition § 837, at 1088.
"We think that the paucity of authority construing the term `assailing thieves' with reference to theft of a vessel (as opposed to theft of goods on board) demonstrates that it was so generally understood that the term never contemplated theft of entire vessels that no effort was made before this case to litigate the point. If the `assailing thieves' peril contemplated theft of the entire vessel, there would be no reason to provide protection, as was done in the policy involved in Feinberg v. Insurance Company of North America, D.Mass. 1958, 161 F.Supp. 686, vacated 260 F.2d 523 [(1st Cir.)] against both `assailing thieves' and `theft of the entire yacht.' We entertain no doubt that the term `assailing thieves' is limited to personal property aboard the vessel taken by force. It is a descriptive phrase, purposefully and precisely coined by the underwriters to distinguish between the theft of personal property by stealth, such as pilferage, and that taken by force. It has nothing whatever to do with insuring against the theft of an entire vessel."
The court also noted in S. Felicione & Sons Fish Co., supra, that the words "all other like perils" cannot extend the scope of the policy to include perils beyond and entirely different from those specially enumerated.
Furthermore, in Southport Fisheries v. Saskatchewan Gov. Ins. Office, 161 F.Supp. 81 (E.D.N.C.1958), the court also said, in examining an insurance policy similar to the one in the present case at 84:
"Keeping in mind the diversities of the perils specifically enumerated, the Court's opinion is that `other like perils' need not be like in character to the qualities possessed by any particular listed risk, but rather must be similar to the perils set forth only in the same manner as the *515 enumerated perils are similar to each other. Put another way, the word `like' means possessing the characteristic common to the group rather than qualities associated with any particular risk. In this manner a particular and definable quality is established as a necessary ingredient of `like peril', and a means determined to make cognizable those perils contemplated was within the coverage of the policies.
"Turning to the listed perils in order to define their common quality, it is noted that circumstances attendant upon maritime commerce render vessels notoriously defenseless against losses effected by fire, lightning, and earthquake. Loss by jettison is a risk certainly peculiar to the sea. Excepting jettison, the man-caused perils set forth in the policies are more likely to befall mariners, as opposed to others, because historically a ship's physical location and total lack of communication has limited its security to that derived from its own resources, thus increasing the possibility of successful warfare or plunder against the same. In short, an examination of the perils set forth in the policies discloses that each has become particularly feared by the maritime world because circumstances surrounding maritime commerce increase the likelihood of loss from such risks. It is this quality which is common to the three categories of risks formally discussed as being within the term `perils of the sea', and in the Court's opinion it is the sole ingredient essential in order to qualify a risk as a `like peril' within the coverage of the policy."
In Southport Fisheries, supra, the court further determined that a spiteful injury to fishing nets was an ordinary risk rather than a "like peril" and, therefore, did not result from a risk insured against within the terms of the insurance contracts. In the present case this court also must conclude that the theft of the plaintiff's entire vessel was an ordinary risk and, therefore, not covered by the term "all other perils" as used in the subject policy.
In this case, we do not find the terms "assailing thieves" and "all other like perils" to be so ambiguous as to demand they be construed against the insurer, and therefore this court holds that the district court was correct in giving legal effect to the provisions of the policy and in holding the theft of the plaintiff's entire vessel was not covered under those provisions. Furthermore, we find plaintiff's argument that the loss of the vessel was directly caused by the breakdown of the motor and, therefore, covered under the inchmaree clause of the policy, to be an erroneous interpretation of the intent of that part of the coverage in the policy.
This court does, however, find error in the district court's dismissal of the plaintiff's case against Dussouy. In the case of Porter v. Utica Mut. Ins. Co., 357 So.2d 1234 (La.App. 2d Cir. 1978), the court stated at 1237-1238:
"The applicable law is concisely stated in Karam v. St. Paul Fire & Marine Insurance Company, 281 So.2d 728 (La. 1973):
An insurance agent who undertakes to procure insurance for another owes an obligation to his client to use reasonable diligence in attempting to place the insurance requested and to notify the client promptly if he has failed to obtain the requested insurance. The client may recover from the agent the loss he sustains as a result of the agent's failure to procure the desired coverage if the actions of the agent warranted an assumption by the client that he was properly insured in the amount of the desired coverage. C.C. 3002 and 3003; Kieran v. Commercial Union Insurance Company of New York, 271 So.2d 889 (La.App. 4th Cir. 1973); Hight v. Stewart, 265 So.2d 640 (La.App. 2d Cir. 1972); Bordelon v. Herculean Risks, Inc., 241 So.2d 766 (La.App. 3d Cir. 1970); Shrv Teletype Coin Exchange, Inc. v. Commercial Union Insurance Company of New York, 191 So.2d 208 (La.App. 2d Cir. 1966); Arceneaux v. Bellard, 149 So.2d 444 *516 (La.App. 3d Cir. 1963); Brown v. Stephens Buick Company, 139 So.2d 579 (La.App. 4th Cir. 1962).
"In order to recover for loss arising out of the failure of an insurance agent to obtain insurance coverage, the plaintiff must prove: (1) an undertaking or agreement by the insurance agent to procure insurance; (2) failure of the agent to use reasonable diligence in attempting to place the insurance and failure to notify the client promptly if he has failed to obtain the insurance; and (3) the actions of the agent warranted an assumption by the client that he was properly insured."
In the present case, because the insurance agent Caron was unable to obtain an "all risks" policy on the boat, as was the type of policy requested by the plaintiff, he had a duty to inform Cambre that the only insurance obtainable on the vessel was a "named risks" policy in order to call the plaintiff's attention to the difference in coverage provided by the policy obtained and the coverage requested by Cambre. It is also apparent from the testimony of the parties that the actions of Caron after he obtained the policy led the plaintiff to believe he had, indeed, secured an "all risks" policy on the skiff. For these reasons, this court holds that the plaintiff has a right to recover from the defendant Dussouy the loss he has sustained as a result of the agent's failure to inform the plaintiff of his inability to procure the desired coverage.
For the reasons assigned, therefore, the district court judgment is reversed in part in favor of the plaintiff, Daniel E. Cambre, and against the defendant John W. Dussouy & Company, Inc., and it is hereby ordered, adjudged and decreed that the plaintiff is awarded damages against John W. Dussouy & Company, Inc., in the amount of Eight Thousand Dollars ($8,000), together with all costs and interest from the date of judicial demand until paid. In all other respects, the trial court decision is affirmed.
REVERSED IN PART; AFFIRMED IN PART.