910 F.2d 224
 17 Fed.R.Serv.3d 896
 OFFSHORE PRODUCTION CONTRACTORS, INC., Plaintiff-Appellee,
Paul N. Dabaillon, Trustee in Bankruptcy of Norman Offshore
Pipeline Contractors, Inc. (formerly Offshore
Production Contractors, Inc.),
Plaintiff-Appellee Cross-Appellant,
v.
REPUBLIC UNDERWRITERS INSURANCE COMPANY, Defendant-Appellee
Cross-Appellee,
v.
BAYLY, MARTIN & FAY OF TEXAS, INC., Defendant-Appellant
Cross-Appellee.
 No. 89-3557.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 29, 1990.
 
 Charles W. Nelson, Jr., New Orleans, La., for defendant-appellant cross-appellee.
 Warren D. Rush, Gina Rush Calogero, Lafayette, La., for Offshore Production Contractors, Inc.
 James Carroll, Peter B. Tompkins, Gelpi, Sullivan, Carroll & LaBorde, New Orleans, La., for Republic Underwriters Ins. Co.
 Appeal from the United States District Court for the Middle District of Louisiana.
 Before POLITZ, JONES, and BARKSDALE, Circuit Judges.
 EDITH H. JONES, Circuit Judge:
 
 
 1
 Bayly, Martin & Fay, Inc. ("BMF") appeals from the district court judgment which concluded that BMF breached its duty to procure builder's risk stand-by insurance on behalf of Offshore Production Contractors Inc. ("OPC"). BMF contends both that Republic Underwriters Insurance Company ("Republic") wrongfully denied coverage for OPC's claim under the policy, and that BMF used its best efforts to obtain the broadest possible coverage. Because the district court did not clearly err when it decided that BMF misrepresented the scope of OPC's coverage and that OPC reasonably relied on BMF's misrepresentations, we affirm.
 
 I.
 Background
 
 2
 Offshore Production Contractors, Inc. ("OPC"), a maritime construction company, lays offshore oil pipelines for the petroleum industry. In September, 1984, OPC contracted with Mesa Petroleum Company to construct a pipeline at Brazos A-7 in the Gulf of Mexico. OPC would connect pipelines running along the floor of the Gulf with Mesa's production platform through a "riser" constructed by OPC. As part of the contract, Mesa required OPC to obtain offshore builder's risk insurance.
 
 
 3
 OPC's Chief Executive Officer Robert Norman contacted Peter Barbara, OPC's regular insurance agent at Bayly, Martin & Fay, Inc. ("BMF"), to obtain the insurance. Barbara was well respected, having spent over 30 years in the insurance industry. He specialized in insurance for enterprises servicing oil companies. Barbara handled over 80 percent of OPC's business through verbal commitments, billing OPC for the premium anywhere from 30 to 90 days after the policy's effective date.
 
 
 4
 In this instance, Barbara recommended that OPC purchase a blanket builder's risk insurance policy, which would permit OPC to submit separate declarations for each project. Barbara quoted Norman two premiums. Standard builder's risk insurance would cost approximately $20,000 depending upon project specifications. For an additional $4,125, Norman could receive coverage for stand-by time.[1] Stand-by coverage insures a company that has mobilized its equipment against losses incurred when equipment or the project itself is damaged, and some of the mobilized equipment or workers must remain idle while the damage is repaired.[2] Because OPC undertook the Mesa project during the fall, OPC estimated that weather in the Gulf might damage equipment, causing down-time while OPC fixed the problem. Consequently, Norman elected to purchase the stand-by coverage.
 
 
 5
 Barbara communicated Norman's decision to Bert Swayles and Tommy Ebner, Jr., two other BMF agents with expertise in drafting stand-by policies. Swayles and Ebner negotiated with Republic Underwriters Insurance Company ("Republic") to formulate OPC's stand-by clause. These drafters started with provisions from other policies, refined and excluded specific terms, and arrived at the current language. Most importantly, they rejected language which would have covered stand-by time "whenever repairs for loss, damage or destruction ... cannot be conducted due to the weather, but pipe laying operations could have been conducted by the contractor if there had been no repairs necessary." Swayles and Ebner delivered the final language to Barbara on September 15, 1984.
 
 
 6
 Barbara discussed the entire insurance contract with OPC. At trial, he did not remember whether OPC asked him if the policy covered incidents like the one at issue in this case, but he did recall discussing the stand-by clause as triggered by weather and by other mechanical problems. Barbara told OPC that since the stand-by clause contained no express exclusions, the policy appeared to cover stand-by "for whatever reason." According to Barbara, once an insured loss occurred, Republic should compensate OPC for all time spent waiting to repair the damage, regardless of the reason for the delay. Barbara mildly qualified these explanations with the caveat that no court had yet interpreted this contract language, and he was uncertain exactly what a court would do.
 
 
 7
 Barbara did not provide OPC with an actual copy of the policy until well after the incident that led to OPC's claim. He also did not ask Ebner or Swayles, the policy's drafters, to interpret the stand-by clause for OPC. Barbara never mentioned the 48-hour deductible which OPC needed to satisfy before Republic would cover stand-by time, or the $100,000 deductible for insured damage. Robert Norman relied upon Barbara's representations when he elected to purchase this insurance. Had Norman even suspected that the stand-by clause would not cover down-time due to weather, he never would have purchased this supplementary coverage.
 
 
 8
 Shortly after purchasing the insurance, OPC used the barge DELTA I to lay Mesa's pipeline. By October 13, 1984, OPC was ready to connect the pipeline on the Gulf bottom to the production equipment on Mesa's platform. OPC raised the end of the pipeline off the sea floor, clamped it to the barge using bear clamps, and began to weld the tube-turn section of the riser onto the pipeline. Half-way through the process, the weather turned threatening and rough seas jolted the barge. The weld broke. OPC rebevelled the ends of the riser and the pipeline, and attempted to reassemble the weld. The weather foiled OPC's efforts.
 
 
 9
 Electing to move its barge to safer waters, OPC placed the riser on the deck, capped the pipeline and dropped it back down to the sea bottom. Tugboats then towed the barge several miles from the platform, where it remained moored until October 24 when it returned to the project site. The storm finally dissipated sufficiently by October 28 to permit OPC to lay pipe. OPC still could not repair the riser. Working from October 28 until November 1, and from November 2 until November 5, OPC eventually abandoned the site again because of bad weather.
 
 
 10
 The weather finally permitted OPC to repair the riser on November 11. After moving its barge back into position abutting Mesa's offshore platform, OPC dispatched divers to the sea bottom to locate the pipeline. High seas had caused the pipeline to drift almost 30 feet from its expected location. OPC again raised the pipeline onto the barge, clamped it with the bear clamps, and repaired the riser. OPC expended approximately 30 hours completing the repairs.
 
 
 11
 Once OPC finished the project, Norman called Barbara to discuss filing a claim for stand-by expenses incurred after the riser weld broke. Barbara advised OPC that the stand-by clause in the builder's risk policy should cover the damage. With Barbara's assistance, OPC prepared a cost accounting and filed its proof of loss with Republic. Upon investigating the incident, Republic denied OPC's claim because the stand-by time resulted from bad weather and not from insured damage to the riser.
 
 
 12
 After Republic denied the claim, Barbara advised OPC not to pay the policy's premium. OPC followed Barbara's advice. On January 23, 1985, Barbara dispatched a letter to Republic cancelling the policy; however, it is unclear whether OPC authorized BMF to draft this cancellation letter. Under the payment scheme established by Republic and BMF, Republic would invoice BMF for an insurance premium shortly after coverage began. BMF became responsible for collecting the premium from the customer, subtracting its commission, and remitting the balance to Republic. If the customer failed to pay, Republic expected BMF to cover the premium. Barbara testified that he "had no other choice except to return the policy and have it cancelled" in order to release BMF from liability for the premium. Upon receipt of Barbara's letter, Republic cancelled the policy.
 
 
 13
 On April 25, 1985, OPC filed this suit in Louisiana state court against Republic, BMF, BMF's "errors and omissions" insurer, and two other defendants who were dismissed by mutual agreement. OPC pleaded in the alternative for recovery under the policy or for monetary damages from BMF. Invoking diversity jurisdiction, defendants removed this case to federal court, where it was tried for two days before the judge. The district court eventually rendered a $250,000 judgment for OPC against BMF and dismissed all other claims.
 
 
 14
 Pursuant to Fed.R.Civ.P. 59(e), on July 10, 1989, Republic moved to amend this judgment to recognize Republic's right to receive a premium should a court on appeal determine that Republic had some liability under the policy. Before the district court acted on this motion, BMF filed a notice of appeal. In an unpublished opinion, we dismissed that appeal as untimely. Offshore Production Contractors Inc. v. Republic Underwriters Insurance et al., No. 89-3505, slip op. at 1 (5th Cir. August 9, 1989). The district court then issued its August 10 amended judgment granting Republic's motion. BMF filed another notice of appeal on August 14. For reasons which are unclear from the record, the district court entered another amended judgment on August 28, 1989, which did not differ materially from the August 10 judgment.II.
 
 DISCUSSION
 
 15
 The parties raise two issues on appeal. Before discussing the substantive question whether the district court committed clear error when it imposed liability on BMF for failing to procure insurance, we must first determine whether BMF brought a timely appeal. We find that it did.
 
 
 16
 Federal Rule of Appellate Procedure 4(a)(4) provides that an appeal filed before the filing of or during the pendency of a timely Rule 59 motion "has no effect." Griggs v. Provident Consumer Discount Co., 459 U.S. 56, 60-61, 103 S.Ct. 400, 403, 74 L.Ed.2d 225 (1982). Once the district court enters an order disposing of the Rule 59 motion, an appellant must file a new notice of appeal in order to invoke appellate jurisdiction. Id. at 61, 103 S.Ct. at 403. If the appellant fails to file a timely second notice, the appellate court lacks jurisdiction to address the merits of the case.
 
 
 17
 OPC argues that BMF failed to file a timely notice of appeal from the final judgment rendered by the district court on August 28. BMF responds that the district court entered its final judgment on August 10 when it granted Republic's Rule 59(e) motion rendering the August 14 notice of appeal timely.
 
 
 18
 A judgment is "final" when it terminates litigation on the merits of the case and leaves the court with nothing to do except execute the judgment. Budinich v. Becton Dickinson & Co., 486 U.S. 196, 108 S.Ct. 1717, 1720, 100 L.Ed.2d 178 (1988); First Nationwide Bank v. Summer House Joint Venture, 902 F.2d 1197, 1199 (5th Cir.1990). In this case, the district court's August 10 judgment fully adjudicated the rights and responsibilities of all parties to this lawsuit. For reasons not reflected in the record, the court essentially reentered its judgment on August 28, without altering any of the litigants' substantive rights.
 
 
 19
 The mere fact that a court reenters a judgment or revises a judgment in an immaterial way does not affect the time within which litigants must pursue an appeal. Federal Trade Commission v. Minneapolis-Honeywell Regulator Co., 344 U.S. 206, 211-12, 73 S.Ct. 245, 249, 97 L.Ed. 245 (1952); First Nationwide Bank, 902 F.2d at 1200; Ellis v. Richardson, 471 F.2d 720 (5th Cir.1973). Rather, the test is "whether the lower court, in its second order, has disturbed or revised legal rights and obligations which, by its prior judgment, had been plainly and properly settled with finality." Id. 73 S.Ct. at 249. In this case, the district court's August 28 judgment did not in any manner alter the legal rights or obligations of any party. Consequently, the August 10 judgment is final and appealable, and this court has jurisdiction to reach the merits of this case.
 
 
 20
 BMF raises two challenges to the district court's ruling that BMF was liable to OPC for failing to procure adequate insurance. First, BMF contends that the district court committed clear error when it concluded that BMF violated its duty under Louisiana law to procure the insurance requested by OPC, or alternatively to inform OPC that it had acquired different coverage. Second, BMF argues that its omissions did not cause OPC's damage: OPC never received coverage under the policy because OPC failed to pay the premium. Even if OPC had remitted the premium, Republic wrongfully denied coverage for the claim. BMF contends that these two actions, rather than its omissions, caused the damage.
 
 
 21
 Under Louisiana law, an insurance broker has a fiduciary responsibility to the insured as well as to the insurer, and he is liable for his own fault or neglect. Neustadter v. Bridges, 406 So.2d 738, 741 (La.App.1981). In order to recover for a loss arising out of the failure of an insurance agent to obtain insurance coverage, the plaintiff must prove:
 
 
 22
 (1) an undertaking or agreement by the insurance agent to procure insurance;
 
 
 23
 (2) failure of the agent to use reasonable diligence in attempting to place the insurance and failure to notify the client promptly if he has failed to obtain the insurance; and(3) actions by the agent warranting the client's assumption that the client was properly insured.
 
 
 24
 Chandler v. Jones, 532 So.2d 402, 405 (La.App.1988); Norred v. Commercial Union Insurance Co., 526 So.2d 829, 835 (La.App.1988 writ denied); Cambre v. Travelers Indemnity Co., 404 So.2d 511, 515-16 (La.App.1981 writ denied); Porter v. Utica Mutual Insurance Co., 357 So.2d 1234 (La.App.1978). See Karam v. St. Paul Fire & Marine Insurance Company, 281 So.2d 728 (La.1973). BMF contends that OPC failed to prove all three elements of its cause of action.
 
 
 25
 There is no doubt that BMF agreed to procure some form of stand-by insurance as a corollary to OPC's builder's risk policy. BMF contends, however, that OPC only expected BMF to acquire the broadest form of stand-by coverage available on the market. Since BMF negotiated with Republic for the most extensive coverage that Republic would provide, BMF contends that it fulfilled its legal duty to OPC. This version of the facts misstates the obligation undertaken by BMF.
 
 
 26
 When OPC first requested insurance from BMF, OPC sought only standard builder's risk coverage for Mesa Petroleum's project. Peter Barbara, BMF's agent, suggested that OPC supplement its policy with stand-by insurance to cover project down-time. OPC had never purchased stand-by insurance before, and knew nothing about the availability or scope of such insurance. However, OPC did express concerns about down-time on the Mesa project that might result from mechanical breakdowns or from bad weather in the Gulf during the fall. When Barbara suggested that OPC could get stand-by insurance to cover down-time, OPC jumped at the chance. OPC never would have purchased stand-by insurance if it had known that the policy excluded weather down-time. Familiar with OPC's operations, and aware of the risks against which OPC wanted insurance, Peter Barbara agreed to procure stand-by coverage.
 
 
 27
 Under this scenario, an insurance agent is more than a "mere order taker" for the insured. Durham v. McFarland, Gay and Clay Inc., 527 So.2d 403, 405 (La.App.1988). His fiduciary duties include advising the client with regard to recommended coverage, investigating and ascertaining the financial condition of prospective companies, and notifying the insured of policy cancellations or terminations. Id. at 405. Where an agent is familiar with the insured's business, has reason to know the risks against which an insured wants protection, and has experience with the types of coverage available in a particular market, we must construe an undertaking to procure insurance as an agreement by the agent to provide coverage for the client's specific concerns.[3]
 
 
 28
 This construction becomes even more important when, as with OPC, the insured knows little about the particular insurance market. In such circumstances, we can hardly expect the insured to request by name the specific coverage which the insured desires. Rather, the agent must guarantee that the policy which he acquires meets at least the insured's specific needs, rather than generally insuring the client against a broad range of contingencies. Based upon these standards, Barbara undertook to procure stand-by insurance for OPC which would provide some coverage for down-time due to weather in the Gulf.
 
 
 29
 Given this undertaking, Barbara did not act diligently to place the insurance. Despite the fact that he recommended standby insurance for OPC, Barbara claims that he knew very little about stand-by clauses. He solicited the assistance of two other BMF agents, Bert Swayles and Tommy Ebner, Jr., to negotiate the language of this clause with Republic Underwriters Insurance. Barbara did not directly participate in the negotiations, nor did he inform Swayles or Ebner that OPC was especially concerned about weather conditions in the Gulf. Swayles, Ebner and Republic expressly rejected language which would have covered OPC's situation.
 
 
 30
 When Swayles and Ebner returned to Barbara with a final draft of the stand-by clause, they did not inform Barbara that weather down-time had been specifically excluded. They did attempt to explain the clause to Barbara, but Barbara claims not to have understood what the clause covered and what it did not. Barbara never contacted other insurance companies to determine what type of coverage they might offer. Instead, he took the policy to OPC and represented that the clause contained the broadest coverage available in the industry. Barbara never informed OPC that OPC could purchase a more expensive policy which would cover exclusively weather down-time.
 
 
 31
 Where an insurance broker has experience in a particular field, that broker should possess reasonable knowledge of the general types of policies available, understand their different terms, and explore the specific coverage available in the area in which [the client] seeks to be protected. First Alabama Bank v. First State Insurance Company, Inc., 899 F.2d 1045, 1068 (11th Cir.1990). Proper diligence requires the insurance broker to "canvass the market" and to be informed about different companies and variations in the available terms. Id. at 1068. If, as in OPC's case, a client directly informs the broker about a particular risk, reasonable diligence requires the broker to address that specific risk, and to determine which insurance company can provide the desired coverage. Id. at 1068. The broker should also understand the specific terms of the policy which he is selling. Where the broker does not understand the policy, reasonable diligence requires the broker to discover what the insurance company intended to include and exclude under the policy's language. Because BMF neglected to address the risk faced by OPC when negotiating the insurance, failed to communicate OPC's concerns from agent to agent, and neglected to determine what Republic would and would not cover under the policy's language, BMF failed to use reasonable diligence when procuring the stand-by insurance.
 
 
 32
 BMF could have avoided liability for this lack of diligence if Barbara had promptly informed OPC that he did not obtain a policy which covered weather down-time. Under Louisiana law, an insurance agent who is unable to procure coverage against a particular risk has a duty to inform the client about the difference between the requested coverage and the coverage provided by the policy actually obtained. Aurillo v. Gressaffa, 405 So.2d 664, 666 (La.App.1981 writ denied); Cambre, 404 So.2d at 515-16 (Where insurer obtained "named risk" rather than "all risk" policy, he had a duty to inform insured). The district court's conclusion that Barbara neglected this duty was not clearly erroneous.
 
 
 33
 Barbara claims that he cannot remember whether or not he informed OPC that its insurance policy would cover down-time resulting from weather-related delays. He evidently did tell OPC that this provision was new, and that he had no idea how a court would construe the language. Barbara should have known from the negotiations between BMF and Republic that the drafters had specifically rejected language which would cover weather stand-by. Louisiana law does not require Barbara to discuss every situation which might arise and for which this policy might provide coverage. However, the law does require Barbara to inform a client when the policy which he procured does not cover a specific risk about which the client expressed concern. Barbara failed to convey the information that this policy did not cover weather-related down-time.
 
 
 34
 The district court concluded that Barbara affirmatively misrepresented the policy's scope. According to the testimony of Lyle Kirlin and Robert Norman of OPC, Barbara told OPC that once OPC suffered insured damage on the project the insurance contract would cover any standby time, regardless of the cause. Barbara adopted the same position after the accident, when he told OPC that Republic would cover the claim. In fact, as explained below, the contract does not provide such coverage. Furthermore, although Barbara did not participate in negotiations with Republic, he should have known that Republic specifically rejected such coverage. The district court did not commit clear error when it concluded that BMF failed to inform OPC about the scope of the stand-by policy.
 
 
 35
 Finally, OPC was justified in relying on BMF's representations. Peter Barbara worked for 30 years in the insurance industry, most particularly purchasing coverage on behalf of oil service companies. Since 1979, Barbara had handled OPC's insurance. He was familiar with OPC's business and had even suggested that OPC purchase the stand-by coverage. OPC respected Barbara's abilities, and often discussed coverage with him over the phone. As in previous dealings, OPC did not receive a copy of the policy until well after it elected to purchase the coverage. OPC frequently relied on Barbara's representations about a policy's terms and conditions. Although Barbara did not know how far a court would stretch the stand-by clause, he evidently conveyed little doubt that the clause would cover any form of stand-by after an insured loss. The district court did not commit clear error when it concluded that OPC justifiably relied on BMF's representations. Consequently, OPC has proven the three elements necessary to state a cause of action for damages against BMF.
 
 
 36
 BMF responds that OPC cannot recover against it for failure to procure a policy because BMF's errors and omissions did not cause OPC's damage. The negligence of an insurance agent is not actionable unless it is a cause in fact of the harm for which recovery is sought. Brunt v. Standard Life Insurance Company, 259 So.2d 575, 578-79 (La.App.1972). BMF contends that OPC's failure to pay the required premium and Republic's wrongful denial of coverage actually caused OPC's injuries. Consequently, BMF should be exonerated even if it was negligent.
 
 
 37
 In order to assess BMF's arguments, we must interpret the insurance agreement between the parties. Under Louisiana law, an insurance policy is a contract, and the rules established for the construction of written instruments apply to contracts for insurance. Stanley v. Cryer Drilling Co., 36 So.2d 9 (1948); Coates v. Northlake Oil Co., Inc., 499 So.2d 252, 255 (La.App.1986 writ denied). The intention of the parties is of paramount importance, and should be determined "in accordance with the plain, ordinary and popular sense of the language used in the agreement and by giving consideration on a practical, reasonable and fair basis to the instrument in its entirety." Muse v. Metropolitan Life Insurance Co., 193 La. 605, 192 So. 72 (1939); Coates, 499 So.2d at 255. An insurance contract "should not be given an interpretation which would enlarge or restrict its provisions beyond what is reasonably contemplated by its terms or which would lead to an absurd conclusion." Coates, 499 So.2d at 255.
 
 
 38
 According to these interpretive principles, it is clear that before the builder's risk policy with the extended standby coverage could become effective, OPC needed to remit the policy premium to BMF. BMF would then subtract its commission and send the balance to Republic. Subsection 7A of the policy provides:
 
 
 39
 A) DEPOSIT PREMIUM --The deposit premium shown on the Construction Project Endorsement shall be payable to the Insured on the effective date of the endorsement.
 
 Subsection 6 continues:
 
 40
 No construction project shall be insured unless provided for by endorsement to this policy by this Company and a premium paid as indicated below. (emphasis added).
 
 
 41
 Under this policy, OPC's election not to pay the premium negated Republic's responsibility to cover the claim.[4]
 
 
 42
 However, this conclusion does not overcome BMF's liability to OPC. BMF was responsible for billing OPC for the premium. Although the policy was to become effective on October 10, 1984, BMF failed to bill OPC until several months later. By that time, OPC and BMF already knew that Republic had denied this claim. BMF counseled OPC not to pay the premium, telling OPC that BMF was compelled to send the policy back to Republic with a notice of cancellation. OPC acquiesced, and BMF cancelled the policy. Now, BMF asserts that its own actions in counselling OPC to default on the premium exonerate BMF from liability for its prior negligence. We will not permit an agent to avoid liability for failure to procure insurance by counselling a client not to pay a premium and then arguing that the claim never would have been honored because the policy never became effective. See, for example, Naulty v. OUPAC, Inc., 448 So.2d 1322, 1328 (La.App.1984) (Agent breaches fiduciary duty by cancelling policy without first consulting client).
 
 
 43
 Finally, BMF contends that it cannot be held liable for failure to procure coverage when it did provide adequate insurance, and Republic wrongfully denied OPC's claim. A careful reading of the insurance policy at issue makes it clear that OPC's claim was not covered. Section 15e of the general builder's risk policy denies coverage for any type of delay except "standby":
 
 
 44
 15) This policy does not insure against loss, damage, or expense caused by or resulting from:
 
 
 45
 e) Loss of market, interruption of business or delay in completion of construction of the property insured hereunder or by loss of use under any circumstances, or penalties for non-completion of, or delay in completion of contract or non-compliance with contract conditions; however, "standby" shall not be construed as subject to this clause. (emphasis added).
 
 
 46
 Section 20 under the Special Conditions defines insured "standby" as:
 
 
 47
 .... operating costs, including leasing costs, rental costs, and labor costs for barges, vessels, tugs, crafts and equipment when said plant and equipment is prevented from being used for normal operations and to rectify loss or damage to the property insured.
 
 
 48
 The claims made by OPC under the standby clause do not meet this definition.
 
 
 49
 As Daniel Barr, agent for Republic, testified, the parties intended this provision to cover time spent repairing insured damage to the property, when equipment normally used for other work is prevented from performing its usual tasks, and is used instead to facilitate the repairs. In the present case, rough weather in the Gulf, and not the insured damage, prevented OPC from using its equipment for normal operations. By its own language, the standby clause does not cover this form of down-time.
 
 
 50
 In addition to the clause itself, the course of negotiations between the parties indicates that Republic never intended to cover OPC's weather down-time. During the negotiations, BMF and Republic rejected the following clause:
 
 
 51
 Notwithstanding anything herein contained to the contrary, the company shall not be liable for any costs arising from delay in the repairing of any loss, destruction or damage which is occasioned by weather, except company will pay standby time whenever repairs for loss, damage or destruction is covered by the policy [and] cannot be conducted due to the weather, but pipe laying operations could have been conducted by the contractor if there had been no repairs necessary. (emphasis added)
 
 
 52
 This clause clearly would have covered any time which OPC spent waiting for the weather to clear sufficiently to make repairs as long as, but for the damage, the weather would have been adequate for OPC to lay pipe. The parties excluded this language, according to Barr, because they never intended this policy to cover weather-related down-time. Barbara contradicts this assertion, but he never participated in the drafting process. BMF failed to call Swayle or Ebner, its negotiators, to testify, justifying the presumption that they would have corroborated Barr's testimony. Arnone v. Anzalone, 481 So.2d 1047, 1050 (La.App.1985). Under these circumstances, it is clear that the parties never intended to cover OPC's losses from the time of the incident to the time that OPC mobilized to repair the riser on November 11.
 
 
 53
 When OPC finally mobilized, it spent approximately 30 hours rewelding the riser. Section 20 of the insurance contract imposes a "deductible" against standby time, requiring OPC to have been mobilized for 48 hours before Republic will reimburse standby costs. OPC did not satisfy this deductible. As a result, the standby clause in the insurance contract did not cover OPC's losses. Republic Underwriters Insurance appropriately denied coverage for the claim. Consequently, Barbara failed to procure insurance requested by OPC which would protect OPC against this loss. For the foregoing reasons, the judgment of the district court is AFFIRMED.
 
 
 
 [1]
 There is some conflict in the record over whether the premium for the stand-by portion of the policy cost $4,125 or $7,000. Since this factual dispute has no impact on our analysis, we adopt the figure offered by Michael Norman, representative of Republic Underwriters Insurance Company, who explained how Republic calculated the various elements comprising the premium
 
 
 [2]
 For example, if a tugboat breaks down during the operation, preventing the work barge from moving to its next location along the pipeline, stand-by insurance could cover the welders' salaries and the daily rental fee for equipment which remains idle while the tugboat is repaired
 
 
 [3]
 Durham v. McFarland, Gay and Clay Inc., 527 So.2d at 406-07 (Agent knew insured needed flood insurance); Cusimano v. St. Paul Fire & Marine Insurance Co., 405 So.2d 1382, 1384-85 (La.App.1981) (Agent knew insured wanted coverage that would pay $250,000 for every incident, rather than just for some incidents); Trahan v. Bailey's Equipment Rentals, Inc., 383 So.2d 1072, 1076-77 (La.App.1980 writ refused); Stacy v. Petty, 362 So.2d 810, 815 (La.App.1978). See also Dooley v. Wright, 501 So.2d 980, 985 (La.App.1987 writ denied) (Agent unaware of risks and inexpert in particular business is under no duty to procure specific insurance); Porter v. Utica Mutual Insurance Co., 357 So.2d 1234 (La.App.1978)
 
 
 [4]
 For this reason, the district court correctly dismissed with prejudice all claims against Republic Underwriters Insurance Co., Cravans Dargan and Co., and Evanston Insurance Company