BONIN, J.,
Dissents with Reasons.
|,1 respectfully dissent.
I
In City Blueprint & Supply Co., Inc. v. Boggio, 08-1093, p. 8 (La.App. 4 Cir. 12/17/08), 3 So.3d 62, 66, we held that an agent has no duty to advise a client that it is “underinsured.” “An insured is responsible for reading his policy and is presumed to know its terms.” Id at p. 7, 3 So.3d at 67. Consequently, the failure of Eaves to advise the school that it was underinsured in its business income and extra expense (BI/EE) coverage was not a breach of any duty it owed the school.
For many years Eaves has provided insurance services, on a non-exclusive basis, to the school. Mr. Cornelius “Hap” Crusel, one of Eaves’ principals, was the primary individual servicing the school’s account. The school is a private school operated by a Board of Governors, which includes two well-known insurance executives and at least one attorney well acquainted with insurance issues. The Board of Governors occasionally discharges its functions through committees, but it did not see fit to create an insurance committee to oversee its insurance needs. The Board, according to the school’s headmaster, delegated this responsibility tojjthe school’s business manager. The primary source of operating income for the school is tuition.[1] The school does not operate for a profit.
During the years that the insurance agent sold insurance policies to the school, he dealt with three different business managers. Over the years he sold a variety of insurance policies to the school, including property, casualty, workers compensation, and flood. He generally met on an annual basis with the business manager and reviewed the coverages and the premiums. These meetings were typically followed by a written proposal from Eaves which set forth that “[t]his presentation is designed to give you an overview of the insurance coverages we recommend for your company.”
For the years 1989 until 1999, the coverage which the Newman school purchased through Eaves included “extra expense” coverage with limits of $250,000. In 1999, this coverage item was expanded to “business income/extra expense” (“BI/EE”), but the limits of the coverage remained at $250,000. In 2000 the business manager’s notes addressed raising business income/extra expense limits from $250,000. The limits of this expanded coverage were not increased until the 2003 policy, when the school increased its limits of coverage to $350,000.[2] Prior to that policy period, the agent had quoted to the business manager the additional premium for increasing these limits to $500,000 and $750,000, respectively, but the school had declined.
*471 When the school hired a new business manager, the Eaves agent met him in early 2004 to review the insurance coverages. Both men testified that the business manager’s primary focus in the subsequent meetings and discussions with the Eaves agent was the premium costs, not the coverages or the limits of coverage.[3] There is no evidence that the business manager reviewed the annual | /recommendation” for coverage furnished the school by Eaves, the last of which was received by the business manager on June 29, 2005; he filed them away in a drawer.
At no time did any of the school’s three business managers request that Eaves obtain increased limits of BI/EE coverage. There is no question that the policy which Eaves recommended to the school and which was issued to the school included coverage for tuition losses. Before the storm and the school’s losses, the business manager had not read the school’s policy: “I did not read my policy in the school or my home until after the storm.” He admits that he should have read the policy.
Approximately two months before the storm, Eaves forwarded its insurance proposal to the school. In that proposal the summary page for the coverages clearly showed that “Business Income/Extra Exp” was included with limits of $350,000. Within the proposal was yet another summary for this coverage which clearly showed that “Tuition & Fees” were “Included” in BI & EE coverage. The business manager testified that he considered this summary “the gory details of the summary that we had seen before ... I would put it in my binder and keep it in my files.” He would have “scanned it just to see if there was anything there” but he did not read it.
Not until after the school sustained damages to its facilities due to Hurricane Katrina on August 29, 2005, and it seemed that the student body would be dispersed because of the catastrophe affecting the entire metropolitan New Orleans area, did the business manager, as well as staff and board members of the school, read the policy. He easily read and understood the clear policy provisions of the BI/EE coverage and instantly grasped the consequences for the school — it was [4woefully underinsured. The school faced losses of its business income, that is tuition, of nearly $3,000,000, but its limits of coverage were only $350,000.
II
The policy itself, with an effective date of July 1, 2005, showed on its Commercial Property Coverage Part, Supplemental Declarations, coverage for “Business Income” with limits of $350,000. One of the forms included in the policy is titled “Business Income (and Extra Expenses) Coverage Form.” Another endorsement form, which modified the other, is titled “Business Income Changes — Educational Institutions.” Among the covered “business activities” are those “which generate tuition and related fees from students.”
The record is clear that in November 2000 the previous business manager had made handwritten notes next to “Blanket Business Income” on the school’s schedule of insurance provided by Eaves dated November 13, 2000 “(temp, reloc.) loss of tuit. inc.”[4] and next to the limits of $250,000 *472 she wrote “consider raising.” On November 15, 2000, The St. Paul Fire and Marine Insurance Company wrote to Eaves: “I received your request for a quote for optional Business Income limits. To increase to $500,000 $999.00 ap To increase to $750,000 $2000.00 ap These are annual premiums.” On November 30, 2000, the agent faxed the letter to the business manager. On his cover sheet he referenced “Business Income.” In the comments, he noted “Quote for additional limits enclosed.” The school did not increase its limits on its business income coverage at that time,’ but later increased its limits to $350,000 for the policy beginning in 2003.[5]
Ill
The trial court predicated its finding of Eaves’ liability on the testimony of Mr. Ronald Wanglin, who is both a certified 15insurance counselor and a certified school risk manager. The trial judge accepted Mr. Wanglin as an expert witness “in the area discussing the customary practices in the industry specially dealing with advice to schools.” He testified that an insurance broker for a private school should use an industry worksheet, such as The St. Paul Travelers Insurance Company’s “business income and extra income (sic) worksheet for colleges and schools.” The purpose of the broker’s using the worksheet is to have a “pretty high level conversation with the business manager ... in determining what the exposure loss is for loss of tuition income as well as what potential continuing extraordinary expenses there might be ...” It is undisputed that the agent never reviewed the industry worksheet with any business manager at the Newman school. From this Mr. Wanglin opined that the agent’s conduct was not reasonable when he failed to obtain the school’s “reappro-val” for the large gap in exposure between a possible loss of tuition income of $14,000,000 and the limit of $350,000 coverage.
IV
“The duty imposed upon the insurance agent ... upon whose advice the client ... depends is that of ‘reasonable diligence’ a breach of which duty results in an action in negligence.” Roger v. Dufrene, 613 So.2d 947, 949 (La.1993).[6] In Parker v. Lexington Insurance Co., 2006 WL 3328041 (E.D.La.11/15/06), Judge Zainey reviewed numerous decisions treating the duty of an insurance agent under Louisiana law. While his review was not exhaustive, it was comprehensive. He concluded that “two common threads emerge in those cases in which an insured states a cause of action against the agent.” Id. at *3.
The first common thread arises from the decisions in Karam v. St. Paul Fire & Marine Ins. Co., 281 So.2d 728, 730 (La.1973), Durham v. McFarland, Gay, & Cla/y, Inc., 527 So.2d 403, 407 (La.App. 4 Cir.1988), and Offshore Prod. Contrs., Inc. v. Republic Underwriters Ins. Co., 910 F.2d 224, 229-30 (5th Cir.1990). In this thread the agent’s liability arises from his failure to procure coverage requested by the insured. This case does not involve Eaves’ failure to provide coverage of business income for tuition loss.
The second thread arises from the line of cases including Zinsel Co. v. J. Everett Eaves, Inc., 99-691 (La.App. 5 Cir. *473 11/30/99), 749 So.2d 798, Taylor v. Sider, 99-2521 (La.App. 4 Cir. 5/31/00), 765 So.2d 416, and Richmond v. Chubb Group of Ins. Cos., 2006 WL 2710566 (E.D.La.09/20/06). As Judge Zainey wrote:
In all of these cases the “advice” that the agent had an affirmative duty to give the insured pertained to aspects of the policies or aspects of insurance law that were not within the knowledge generally held by a lay person. In other words, the information that the agent had a duty to provide was something about which the agent had superior knowledge given his insurance expertise, and the agent’s specific knowledge of the insured’s individual situation triggered that duty to disclose.
Parker, 2006 WL 3328041, at * 3-4.
This thread bears closer scrutiny to consider properly whether Eaves is liable to the school on the facts of this case. In Zinsel the court found that “there was no evidence that Eaves had undertaken to make sure that [its client] had the maximum available flood insurance.” Zinsel, 99-691 at pp. 3-4, 749 So.2d at 799. The court determined that any duty Eaves had to notify its client of the availability of increased limits of flood was satisfied by the insurer’s direct notice which was sent to the client “who speculated that either he or his secretary may well have thrown it in the trash as junk mail.” Id. at 99-691 at pp. 6-7, 749 So.2d at 800-801.
17In Taylor v. Sider, 99-2521, p. 4, 765 So.2d at 419, our court considered whether the client had stated a cause of action against her agent for breach of a fiduciary duty by failing to advise the client of uninsured motorist coverage and the nature of anti-stacking provisions. The plaintiff alleged that if she had been properly informed, she might have opted for a different type of coverage. Similarly, in the context of a contention of fraudulent join-der in opposition to a motion to remand, the federal court decided that an insurance agent who was alleged to have breached his duty to inform and offer his clients “excess flood insurance and contents coverage ” was not fraudulently joined. Richmond v. Chubb Group of Ins. Cos., 2006 WL 2710566, at * 5 (emphasis added). This thread of cases reveals that insurance agents have a fiduciary duty to their clients in those areas of insurance in which the client would ordinarily require guidance.
In the instant case Eaves did not undertake to procure the maximum limits of business income coverage for the school. The school had been informed by Eaves that policy limits in excess of double the $350,000 it ultimately selected were available, but the school for whatever reason did not increase its limits beyond $350,000.[7] The school was notified of the business income coverage and of the limits by Eaves and by its policy. Thus, as in Zinsel, any duty to the school was discharged by Eaves.
Although the school argued that it did not understand the coverage, it is not arguing that it did not have the proper coverage. There was no dereliction of duty on the part of Eaves in failing to provide the business income (tuition loss) coverage. While the school may not have realized that it was covered for tuition | Joss, under the second thread of cases no liability can attach to Eaves for failure to procure the proper coverage.
The only basis for imposing liability upon Eaves would be if it had an affirma- *474 live duty to the school regarding the limits of the business income coverage. In Smith v. Millers Mutual Ins. Co., 419 So.2d 59, 65 (La.App. 2d Cir.1982) the court considered the liability of an agent for failing to recommend higher limits of liability coverage. The court noted:
The stated liability limits of an insurance policy is not a complex matter or provision. Although an insured should not be held to have read and understood the complex and often confusing intricate details of an insurance policy, an insured should be held to have read and know the liability limits of his insurance policy, plainly disclosed on the face of the policy, particularly where, as here, the insured is an experienced businessman, signed an application showing the policy limits, and has received copies of his policy each year for several years with advice to review it. (emphasis added).
The court in Smith concluded that there was no breach of duty by the insurance agent with regard to recommending higher limits. Similarly, in Graves v. State Farm Mutual Auto Ins. Co., 01-1243 (La.App. 3 Cir. 6/26/02), 821 So.2d 769, the client argued that his agent had a duty to advise him to carry higher limits for his automobile liability coverage or purchase an umbrella policy. Under the facts of that case, the court decided that the agent was under no “affirmative duty to inquire into [the client’s] financial condition and make recommendations.” Id. at p. 7, 821 So.2d at 774.
Returning to the Parker decision referenced above, the clients argued that their agent “had a duty under Louisiana law to advise them to purchase flood coverage with higher limits and that his failure to do so caused them to be underinsured.” Parker, 2006 WL 3328041, at *4 (emphasis added). The value of the clients’ property was not a matter of which the agent had the superior | ^knowledge: “[plaintiffs were in a far better position than [their agent] to know that their property was worth more than the coverage limits that they selected.” Id. (emphasis added).
The majority opinion now imposes a new duty on the agent “to spontaneously identify a client’s needs and advise him whether he is underinsured.” See Dobson v. Allstate Ins. Co., Nos. 06-0252, 06-1097, 06-1064, 06-1255, 06-1734, 06-1585, 2006 WL 2078423 (E.D.La.7/21/06). “Agents do not have a duty to advise clients whether they are underinsured. Clients, not agents, are responsible for reading their policies and communicating their insurance needs.” Cameron Parish School Board v. State Farm Fire and Cas. Co., 560 F.Supp.2d 485, 489 (W.D. La. 5/19/08) (Minaldi, J.); Dobson, supra., 06-0252, 2006 WL 2078423, at *12 (holding that the client is “chargeable with knowledge of the terms of [its] policy ...”).
V
The school, unaided by its insurance broker, was quite capable of evaluating its exposure to tuition income loss in the event of a catastrophe. A mathematical calculation- — the number of students multiplied by tuition charges — would yield the information, and the school was in a superior position to Eaves in the knowledge of the number of students and the amounts of tuition. The majority opinion in my view erroneously defers to the trial court which erred as a matter of law in its reliance upon the expert testimony of Mr. Wanglin in order to establish a breach of duty by Eaves. Mr. Wanglin’s testimony essentially posited that an insurance agent for a private school is required to make the school aware if it is underinsured. Until now, this has not been the law in Louisiana.
*475 The school points out that the agent gave as an example of the Extra Expense portion of the Business Income/Extra Expense coverage, the expense of renting or buying trailers for use as temporary classrooms on the school’s football | infíeld in the event of a disaster.[8] School staff and board members who testified appear to have parroted this example whenever the topic of insurance coverage arose. The evidence showed that the school’s focus of insurance concerns shortly before Katrina was raising liability coverage limits in the aftermath of a large judgment against a local community center close to the school rather than the “trailers on the football field” specter, with no one imagining the nature and extent of the actual disaster, Katrina, that occurred.
The broker’s example did not constitute a voluntary undertaking to explain the entire policy, nor did it address limits of coverage. Even if the example rose to the level of a representation, which I do not think that it does, it was not reasonable for the school to rely on it to determine its coverage limits, which the school was in a unique position to determine based on its internal information.[9]
I, therefore, respectfully dissent.

. Tuition represents about 90% of the school’s revenue; other sources include withdrawals from the endowment, State of Louisiana payments for mandated services, and auxiliary fees. At the time of the storm, enrollment at the school was around 1,152 students who paid average annual tuitions of $14,000.

. The fire coverage for the school’s physical plant was approximately $31,000,000.

. The school’s business manager testified that he was hired to address delinquencies in the tuition payments.

. The record does not clarify whether the "inc.” is an abbreviation for "income”, “in-eluded,” "increase,” or some other possibility-

. Increasing policy limits for tuition loss is not the only way to manage the risk. After the storm, the school's Board of Governors changed its tuition contracts “so that in the event of another climactic catastrophe, no parent would get anything back.”

. Roger involved an allegation that the insurance agent failed to provide coverage for the corporation’s employee while driving his own personal vehicle for company business.

. It is difficult to believe that the school would have selected $14,000,000 (which the expert witness testified was the potential loss of tuition income) or even $3,500,000 limits had the agent discussed such limits since it caviled about a $100,000 coverage increase.

. COUCH ON INSURANCE 3D, § 185.14 (2005), explains: “Business interruption coverage was intended to insure against loss of earnings, and in absence of loss of earnings, liability is limited to extra expense necessary to prevent loss of earnings." See also Eric M. Holmes, HOLMES'S APPLEMAN ON INSURANCE, 2D, § 1.11.

. The school staff and board knew enrollment for each semester, tuition charges and other private financial information to determine "bottom line" sums needed to replace tuition income to maintain the school.