<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 98-9004

                SANFORD INSTITUTION FOR SAVINGS,

                     Plaintiff, Appellant,

                               v.

                     MICHAEL A. GALLO, JR.,

                      Defendant, Appellee.

                      ____________________

            APPEAL FROM THE UNITED STATES BANKRUPTCY

             APPELLATE PANEL FOR THE FIRST CIRCUIT

                [Hon. William C. Hillman, Judge]
                 [Hon. Henry J. Boroff, Judge]

                      ____________________

                             Before

                    Torruella, Chief Judge,

Rosenn, Senior Circuit Judge,

                   and Stahl, Circuit Judge.

                     _____________________

    Thomas C. Bradley, with whom Michael K. Martin and Petruccelli
& Martin were on brief, for appellant.
    James F. Molleur, with whom Woodman & Edmands, P.A. was on
brief, for appellee.

                      ____________________

                      September 4, 1998
                      ____________________

         ROSENN, Senior Circuit Judge.  This appeal raises an
important question pertaining to the discharge in bankruptcy of a
debt for property that was obtained by fraud.  Title 11 U.S.C.
523(a)(2)(A) provides that the debtor shall be denied a discharge
of any debt for money or an extension of credit to the extent
obtained by a false representation or actual fraud.  It is
undisputed that the debtor, Michael A. Gallo Jr., knowingly made
false representations to the Sanford Institution for Savings ("SIS"
or "the Bank") on the basis of which he obtained a standby letter
of credit from it for $250,000.  SIS objected to the discharge of
Gallo's debt stemming from SIS's payment honoring the letter of
credit.  Gallo,  however, contended that the United States Supreme
Court construed the statute in Field v. Mans, 516 U.S. 59 (1995),
as inapplicable when the victim does not justifiably rely on the
debtor's fraudulent representation.
         The bankruptcy court rejected the Bank's objection and
ordered the debt discharged.  SIS appealed to the circuit's
bankruptcy appellate panel which affirmed the decision of the
bankruptcy court by a two-to-one majority.  In re Gallo, 216 B.R.
306 (B.A.P. 1st Cir. 1998).  SIS timely appealed to the Court of
Appeals.  We reverse.
                               I.
         On June 19, 1996, Appellee Gallo filed a petition in
bankruptcy pursuant to Chapter 7 of the federal bankruptcy code in
the United States Bankruptcy Court for the District of Maine.  See11 U.S.C.  701-66 (West 1993) (codification of Chapter 7).   SIS,
the appellant, is a creditor of Gallo's, having obtained a default
judgment against him in state court in excess of $300,000.  In the
bankruptcy proceeding, pursuant to  523(a)(2)(A), SIS filed an
adversary action against Gallo seeking to have the debt declared
nondischargeable on the ground that Gallo had procured by fraud a
$250,000 letter of credit underlying the debt.  After a bench
trial, the bankruptcy court found that SIS was not justified in
relying on misrepresentations Gallo made to SIS and held the debt
dischargeable.  In re Gallo, 208 B.R. 756 (D. Maine 1997).
         The important facts are not in dispute.  See In re
Gallo, 208 B.R. at 757-58. In December 1989, Gallo, a longtime and
faithful customer of SIS,  requested a standby letter of credit
from SIS to be issued to People's Heritage Bank, which had agreed
to finance a hotel development project of Gallo's in Ogunquit,
Maine.  Gallo, a busy and respected real estate developer residing
in Sanford, Maine, had obtained numerous loans from SIS since the
1970s, including a $150,000 unsecured line of credit.  Gallo had
always timely repaid each loan and maintained an exemplary record
with SIS.  SIS President Rodney Normand handled many, if not all,
of Gallo's loans and submitted Gallo's letter of credit request to
the Bank's board of directors.  The board authorized the letter of
credit on the condition that Gallo give SIS a second mortgage on
his home (SIS already held a first mortgage), which he had owned
jointly with his wife, Gail Gallo, and a second mortgage on the
hotel property.
    In July 1989, unknown to SIS, Gallo had transferred his
interest in his home to his wife pursuant to a separation
agreement.  SIS was unaware of this transfer, although the mortgage
required notice to it from the mortgagors in such an event.
Approximately four days after requesting the letter of credit,
Gallo received and executed the required documents.  However,
outside the presence of SIS officials, Gallo had forged his wife's
signature to the underlying documents.  The bank required Gail
Gallo's signature because it believed that she, along with her
husband, jointly owned their home and had to consent to the
mortgage.  It is undisputed that Gail Gallo did not know of or
consent to the signing of her name to the security documents.  
Normand, the bank president, signed as a witness to Gail Gallo's
signature even though he did not personally see her sign the
documents.  In sum, Gallo falsely represented to the bank that he
and Gail Gallo still held an interest in the home and that she had
signed the supporting documents.
    SIS did not perform a title search for the Gallos' home
in this instance even though the bankruptcy court found that it was
the Bank's normal policy to do so with mortgage loans.  SIS did not
do so in this case because Normand considered Gallo to be an
honest, reliable, and trustworthy customer who had a long history
of scrupulously meeting his previous obligations to SIS.  Besides,
Gallo was in a great deal of haste in obtaining the letter of
credit because of pressure in meeting the closing date on the hotel
project.
    The hotel development project went awry.  On July 18,
1991, People's Heritage Bank presented the letter of credit to SIS
and requested payment of the full amount.  SIS honored its standby
letter of credit to Gallo and paid People's Heritage Bank $250,000
on July 24, 1991.  SIS later obtained a default judgment against
Gallo in the amount of $301,594.22, including interest, attorneys'
fees, and costs.  The judgment has not been satisfied.
    Following trial, the bankruptcy court held that the debt
was dischargeable notwithstanding Gallo's fraud because the Bank
did not justifiably rely on his misrepresentations to it.  
Specifically, the court held that SIS did not justifiably rely on
Gallo's two false representations, i.e., that he owned his home or
that his wife had signed the loan documents.  The court reasoned
that "[w]hether SIS justifiably relied on the signed loan documents
is dependent upon whether or not SIS had an obligation to
investigate title to the property."  See 208 B.R. at 759.   The
court held that, because SIS was a "sophisticated" lender, it was
required to act in accordance with its normal policy and perform a
title search before it could rely on Gallo's statement that he had
an interest in the home.  See 208 B.R. at 758-59.  In affirming the
bankruptcy court's decision, the bankruptcy appellate panel
reasoned that if SIS had performed a title search, it would have
discovered that Gallo no longer owned an interest in the home.  
This would have put the bank on notice that something was wrong and
should have caused it to refuse Gallo's request for the letter of
credit.  See 216 B.R. at 310 n.4
                              II.
    The adversary action is a core proceeding because it is
an objection to the discharge of a debt.  See 28 U.S.C.
157(b)(2)(J).  Thus, the bankruptcy court had subject-matter
jurisdiction pursuant to 28 U.S.C.  157(a) and 1334(a).  The
bankruptcy appellate panel had appellate jurisdiction pursuant to
28 U.S.C.  158(b)(1).  This Court has appellate jurisdiction
pursuant to 28 U.S.C.  158(d) and 1291.
                              III.
    This case presents a sole legal issue:  namely, whether
the bankruptcy court properly applied to the facts the "justifiable
reliance" element of the fraud interpretation announced by the
Court in Fields v. Mans.  Thus, this Court exercises plenary
review.  See Monarch Life Ins. Co. v. Ropes & Gray, 65 F.3d 973,
978 (1st Cir. 1995).
    Title 11 U.S.C.  523(a)(2)(A) bars from discharge in
bankruptcy a debt for money, property, services, or an extension,
renewal, or refinancing of credit, obtained by false pretenses, a
false representation, or actual fraud.  In Field v. Mans, the
Supreme Court construed this provision to require the creditor to
prove that its reliance on the misrepresentation was justified in
order to avoid discharge.  516 U.S. at 61; accord Palmacci v. Umpierrez, 121 F.3d 781, 786 n.3 (1st Cir. 1997); Matter of Bero,
110 F.3d 462, 465 (7th Cir. 1997); In re Bilzerian, 100 F.3d 886,
892 (11th Cir. 1996), cert. denied, 118 S. Ct. 1559 (1998); In re
Apte, 96 F.3d 1319, 1322 (9th Cir 1996).  The Court rejected the
argument that the more demanding "reasonable reliance" standard
applied.  See id. at 70 (citing and adopting Restatement (Second)
of Torts  545A, cmt. b, which states that plaintiff's conduct does
not have to conform to "reasonable man standard").
    The Court adopted the dominant common-law formulation of
the elements of fraudulent misrepresentation as set forth in the
Restatement (Second) of Torts  537-45 and Prosser and Keeton on
Torts  108, at 750-52.  In contrast to the reasonable reliance
standard, in order to show justifiable reliance, the creditor need
not prove that he acted consistent with ordinary prudence and care.  
"'The design of the law is to protect the weak and credulous from
the wiles and stratagems of the artful and cunning, as well as
those whose vigilance and security enable them to protect
themselves' and 'no rogue should enjoy his ill-gotten plunder for
the simple reason that his victim is by chance a fool.'"  Prosser
108, at 751 (citations omitted).
    The rationale for placing this relatively low burden on
the victim of the misrepresentation is rooted in the common law
rule that the victim's contributory negligence is not a defense to
an intentional tort.  See Restatement (Second) of Torts  545A &
cmt. a; Prosser  108, at 750; accord Apte, 96 F.3d at 1323.  In
such circumstances, the equities weigh in favor of giving the
benefit of the doubt to the victim, careless as it may have been,
and even though it could have been more diligent and conducted an
investigation. This rationale was most clearly stated by Lord
Chelmsford in Directors of the Central R. Co. of Venezuela v. Kisch, 2 H.L. 99, 120 (1867):
    But it appears to me that when once it is
    established that there has been any fraudulent
    mis-representation or wilfull concealment by
    which a person has been induced to enter into
    a contract, it is no answer to this claim to
    be relieved from it to tell him that he might
    have known the truth by proper inquiry.  He
    has a right to retort upon his objector, 'You,
    at least, who have stated what is untrue, or
    have concealed the truth, for the purpose of
    drawing me into a contract, cannot accuse me
    of want of caution because I relied implicitly
    on your fairness and honesty.'

    A party may justifiably rely on a misrepresentation even
when he could have ascertained its falsity by conducting an
investigation.  See Restatement (Second) of Torts  540, 541 cmt.
a (1976); Prosser  108, at 753; see also Field, 516 U.S. at 70.  
This rule applies whether the investigation would have been costly
and required extensive effort or could have been made without "any
considerable trouble or expense."  Restatement  540 cmt. a;
Prosser  108, at 753. This pragmatic rule of conduct is at the
heart of millions of commercial transactions conducted daily in
this nation which rely on the honesty and truthfulness of
representation made by the parties.  For example, it is common
knowledge that the stock exchanges of this nation depend upon and
are fueled by representations of the parties which are conducted
without preliminary investigations.  However, the reliance on
misrepresentations known by the victim to be false or obviously
false is not justified; falsity which could have been discovered by
senses during a cursory glance may not be relied upon.  Restatement
540 cmt. a; see also id.  541 & cmt.; accord Prosser  108, at
750, 751.
    The illustration following Restatement  540 is
particularly instructive in this case:
         A, seeking to sell land to B, tells B that
         the land is free from all incumberances.  
         By walking across the street to the office
         of the register of deeds in the
         courthouse, B could easily learn that
         there is a recorded and unsatisfied
         mortgage on the land.  B does not do so
         and buys the land in reliance upon A's
         misrepresentation.  His reliance is
         justified.

    Gallo reiterates the statement of the bankruptcy court
that SIS could not justifiably rely on his statements because it
could have conducted a routine title search and discovered that he
no longer owned the home he had pledged as security for the loan.  
The bankruptcy court equated a title search by a financial
institution with the "cursory investigation" referred to in
Restatement  541, cmt a.  Gallo contends that the "qualities" and
"characteristics" SIS possessed as a sophisticated financial
institution required it to suspect that Gallo was attempting to
commit fraud.   See Restatement  545A cmt. b.
    We disagree.  We conclude that the bankruptcy court and
bankruptcy appellate panel misapplied the justifiable reliance
standard.  In light of Gallo's extensive and trustworthy
relationship with SIS and representation that he owned an interest
in the home and that his wife had agreed to the mortgage, SIS was
not required to take the investigative step of obtaining a title
search to confirm those statements.  See Restatement  540, illus.
1.  The law is clear that SIS was entitled to rely on the
statements unless there were warning signs of their falsity, even
if obtaining a title search was easy and a matter of bank policy.  
Restatement  540, cmt. a.  In the absence of any warning signs
(i.e., obvious or known falsities, see Restatement  541) either in
the documents, in the nature of the transaction, or in Gallo's
conduct or statements, the Bank justifiably relied on his
representation.  Its qualities and characteristics as a
sophisticated lender did not require it to do a title search when
presented with a transaction that, on its face, appeared free of
fraud.  This was not the case here.  Gallo specifically represented
to SIS that he owned the home with his wife and that his wife had
agreed to the mortgage and signed the documents.  Those statements
were consistent with the documents and his conduct.
    The illustration in the Restatement  540 quoted above,
which was cited with approval by the Supreme Court, could not be
more on point.  In the example, a buyer of real property relies on
the seller's representation that the property is unencumbered by
liens.  The buyer could have investigated the claim and determined
its falsity by walking "across the street" and examining readily
available public records.  According to the Restatement, the
failure to conduct this simple and easily undertaken investigation
would not preclude a cause of action by the buyer against the
seller because reviewing even these easily obtained records is an
investigation and an investigation is not required when the
misrepresentation is intentional.  See Restatement  540 illus. 1.  
The illustration replicates the facts of this case almost
completely.
    Additionally, SIS had numerous other reasons to rely on
Gallo's statements aside from the regularity of the security
documents.  Prior to this incident, Gallo was reputed to be an
honest, trustworthy, and reliable businessman in the community and
was a long-time SIS customer who always paid off his previous loans
with the Bank.  He had a strong business and somewhat personal
relationship with Normand.  Further, Gallo's representations that
he owned the home he pledged as security and that his wife had
signed the loan documents were not implausible or obviously false,
especially in light of his previous mortgage.  Certainly, the
representations of a long-time customer with a reputation for
honesty and trustworthiness and an excellent track record of
consistent loan repayments was a basis on which to justify
reliance.
    The exercise of reasonable care would have required a
title search to determine whether Gallo still actually owned the
property he pledged as collateral.  SIS was likely negligent for
failing to do so.  Nonetheless, its lack of care does not exculpate
Gallo's fraud and dishonesty.  The court should not reward him for
his fraud because the Bank should have been more circumspect.  
SIS's negligence does not relieve Gallo of continued responsibility
for his intentional tort.  See Apte, 96 F.3d at 1323; Restatement
545A.  The Supreme Court, the Restatement, and Prosser on Tortsare unmistakably clear that SIS was not required to make an
investigation and that it justifiably relied on Gallo's statements.
                              IV.
    For those reasons, we will reverse the bankruptcy
appellate panel and remand with instructions to vacate the
bankruptcy court decision and direct the bankruptcy court to enter
judgment for SIS barring the debt from discharge.

                                                 Dissent Follows

    STAHL, Circuit Judge, dissenting.  Unlike the majority,
I would leave intact the ruling of the bankruptcy court, affirmed
by the bankruptcy appellate panel, that SIS, acting through Roger
Normand, did not justifiably rely upon Gallo's false affixation of
his then-wife's signature to the loan documents.  But even if I
could agree that Normand's putative reliance was justifiable, I
would vacate and remand for fact-finding on an issue the lower
courts did not reach:  whether Normand relied in fact upon the
forged signature.  For both these reasons, I dissent from the
majority's reversal of the lower court's judgment.
                               I.
    As an initial matter, I disagree with the majority's
statement that "[t]his case presents a sole legal issue . . . [over
which] this Court exercises plenary review."  Ante at 5.  So long
as there is no indication that the lower courts misapprehended the
relevant legal principles (and my review of their opinions reveals
that they were fully aware of the applicable justifiable reliance
standard, as explicated by the Supreme Court in Field v. Mans, 516
U.S. 59 (1995)), a finding that Normand's reliance, if any, was
unjustified is a paradigmatic fact-dominated mixed fact/law
determination that we should accept unless shown to be clearly
erroneous.  See In re Extradition of Howard, 996 F.2d 1320, 1328
(1st Cir. 1993) (explaining this circuit's sliding scale approach
to mixed fact/law determinations); see also In re Apte, 96 F.3d
1319, 1324 (9th Cir. 1996) (reviewing for clear error a no-
justifiable-reliance determination made in a bankruptcy court
proceeding); cf., e.g., Henry v. Connolly, 910 F.2d 1000, 1003 (1st
Cir. 1990) (reviewing for clear error determination of no-
reasonable-reliance made on a misrepresentation claim brought under
Massachusetts law); Piekarski v. Home Owners Sav. Bank, F.S.B., 956
F.2d 1484, 1493 (8th Cir. 1992) (reviewing for clear error
determination of justifiable reliance made on a misrepresentation
claim brought under Minnesota law); Offshore Prod. Contractors,
Inc. v. Republic Underwriters Ins. Co., 910 F.2d 224, 232 (5th
1990) (reviewing for clear error determination of justifiable
reliance made on a misrepresentation claim brought under Louisiana
law).  Thus, we are empowered to reverse only if, on our review of
the record as a whole, we have a "definite and firm conviction that
a mistake has been made."  Anderson v. City of Bessemer City, 470
U.S. 564, 573 (1985) (citation and internal quotation marks
omitted).
    Perhaps because I see the standard-of-review question
differently than the majority, I also am at a loss to understand
its appellant-friendly recitation of the facts relevant to the
question we must answer.  Because the trial court, following a
bench trial, pretermitted the question of reliance in fact but
agreed with Gallo that any reliance by SIS was unjustifiable, we
are obliged to view the facts in the light most flattering to its
conclusion.  See La Esperanza de P.R. v. Prez Y CIA. de Puerto
Rico, Inc., 124 F.3d 10, 12 (1st Cir. 1997).  So viewed, the facts
on which we should base our judgment are as follows.     
    In his trial testimony, Normand admitted that, although
he telephoned Gallo on the afternoon of Wednesday, December 20,
1989, to inform Gallo that the Board had approved the request for
the letter of credit, he did not inform Gallo of the requirement of
a second mortgage on the Sanford home until the morning of Friday,
December 22, 1989, when Gallo arrived in his office to sign the
loan documents.  Normand did not explain why he chose to wait until
Friday to inform Gallo of the Board's unanticipated (by Normand and
Gallo) condition on the letter of credit.  Nor did Normand explain
his failure to ask Gallo and his wife to come in to sign the
documents, even though Normand thought at the time that Gallo and
his wife were co-owners of the Sanford home.   
    Normand further testified that, when he informed Gallo
that SIS's Board of Directors would require a second mortgage on
the Sanford home in order to issue the requested letter of credit,
Gallo told him that his wife "did not want or did not like a second
mortgage on the property and that he [sic] would object to having
it."  Despite this signal that Gallo's wife would object to the
Board's condition, Normand permitted Gallo to take the documents
from his office with the following promise:  "I will get her to
sign."  And later that same day, Normand uncritically accepted back
from Gallo the loan documents with what purported to be Gallo's
wife's unwitnessed signature.  Normand then signed his own name to
the blank witness line without so much as a telephone call to
Gallo's wife to confirm that she had indeed assented to the
mortgage.  Finally, despite the fact that the letter of credit
constituted what Normand described as "a very heavy loan for us,"
Normand thereafter declined to follow customary SIS practice and do
a title search on the property -- a search that would have informed
SIS that Gallo was misrepresenting that he had an interest in the
property and surely would have caused SIS to question Gallo's wife
about whether she had, in fact, assented to the mortgage.
    In view of this evidence, I cannot say with a definite
and firm conviction that the trial court erred in concluding that
Normand proceeded in the face of what amounted to a warning that a
deception was underway.  And as the Supreme Court acknowledged
while explaining the justifiable reliance standard, such a warning
puts to its recipient a duty to investigate (at least cursorily)
before there may be justifiable reliance upon the
misrepresentation.  See Field, 516 U.S. at 71 (citing W. Prosser,
Law of Torts  108, at 718 (4th ed. 1971)).   
    Yet Normand failed to undertake either of the cursory
investigative routes obviously available to him at the time of
Gallo's highly irregular document submission; he neither telephoned
Gallo's wife to confirm her signature before witnessing it, nor
searched the title of the property in question.  In my opinion,
Normand's inaction constituted a breach of the duty to investigate.  
The trial court therefore did not err in concluding that Normand
(and, derivatively, SIS) assumed the risk arising from Gallo's
conduct.  See Restatement (Second) of Torts  545A, Cmt. b. (1976)
(when the recipient of a misrepresentation proceeds in the face of
facts making obvious the falsity of the representation, "his
conduct is more analogous to assumption of the risk than to
contributory negligence").
                              II.
    Even if I agreed with the majority that Normand's
putative reliance on Gallo's wife's signature was justifiable as a
matter of law, I would remand for further fact-finding as to
whether Normand relied in fact upon the signature.  Cf. Field, 516
U.S. at 76 (noting that "the greater the distance between the
reliance claimed and the limits of the reasonable, the greater the
doubt about reliance in fact").  Because the bankruptcy court
deemed any reliance in fact unjustifiable, it did not decide
whether there was such reliance.  Yet the facts just outlined
suggest, to say the least, that Normand did not view the second
mortgage as necessary.  Moreover, I believe it worthwhile to
emphasize one additional point not mentioned by the majority:  
although the other second mortgage required for the letter of
credit -- the second mortgage on the development -- was recorded in
due course, the mortgage on the Sanford home was not recorded until
1991, nearly two years after the letter of credit issued and a mere
one week after another creditor recorded a $1.2 million lien
against Gallo.  I regard this lapse, which Normand was unable to
explain at trial, as especially curious because it was the mortgage
on the Sanford home on which the Board had insisted (apparently
over Normand's disagreement).  One can only assume that the Board
insisted on the second mortgage on the home because it viewed the
second mortgage on the development as insufficient to protect its
interests in the event of a default and a calling of the letter of
credit.
                              III.
    Had the facts described above been adduced in a criminal
bank fraud trial, they surely would have been sufficient to justify
the giving of a willful blindness instruction.  These same facts
thus should be regarded as adequate to ground the trial court's
determination that Normand did not justifiably rely on Gallo's
forgery because Normand effectively ignored a warning that Gallo
had forged his wife's signature to the loan documents.  
Alternatively, these facts should be regarded as sufficient to
warrant a remand for inquiry into whether Normand relied in fact on
Gallo's forgery.
    I dissent.

</body>

</html>